**UNITED STATES of America**

v.

**James S. HILL, Jr., James Hill, Appellant.**

**No. 91–1576.**

United States Court of Appeals, Third Circuit.

Submitted Jan. 27, 1992.

Decided June 22, 1992.

---

Joel H. Slomsky, Philadelphia, Pa., for appellant.

Joseph T. Labrum, III, Office of U.S. Atty., Philadelphia, Pa., for appellee.

Before: STAPLETON, SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

James Hill was convicted of various drug and weapons offenses. In this appeal, he contends that (1) there was insufficient evidence to support his conviction of illegal use of a firearm in relation to a drug crime, (2) a warrantless search of his store violated his Fourth Amendment rights, and (3)

certain testimony regarding communications between him and his wife should have been excluded at trial. We will affirm.

### I.

After serving the minimum term of a 2½ to 10 year state sentence for voluntary manslaughter, Hill was paroled in 1984. Under the terms of his parole, Hill was forbidden from using or possessing controlled substances, owning or possessing weapons, engaging in assaultive behavior, or consuming alcohol.[1] On March 13, 1989, Hill's estranged wife Elnora called her husband's parole agent, Steven Nisenfeld, to report that Hill had assaulted her. In an interview conducted later that day, Mrs. Hill told Nisenfeld and his supervisor, Christopher Pandolfo, that Hill kept drugs and a gun in the home they jointly owned. (Hill was living elsewhere at the time.) At that point, the parole agents decided to take Hill into custody. They then accompanied Mrs. Hill to the residence, where she admitted them. In the ensuing search, Nisenfeld and Pandolfo found rifles, cocaine, and a .22 caliber pistol. Mrs. Hill stated that all these items belonged to her husband.

Mrs. Hill then told the parole agents that Hill would likely be found at his nearby barbecued chicken store. The agents called the Philadelphia Police Department for assistance, and after the police arrived, Hill was arrested for violating the terms of his parole. Nisenfeld and the police officers then took Hill to his apartment above the store, where two more guns were seized. After this, Hill was driven to the district office of the parole department for processing on parole violation charges.

The next day, March 14, 1989, Mrs. Hill returned to the parole office to complete

---

1. According to regulations promulgated by the Pennsylvania Board of Probation and Parole,

 If parole is granted, the parolee shall be subject to the following conditions: ...

 (5) ...

 (i) Abstain from the unlawful possession or sale of narcotics and dangerous drugs and abstain from the use of controlled substances ... without a valid prescription.

 (ii) Refrain from owning or possessing firearms or other weapons.

 (iii) Refrain from an assaultive behavior. 37 Pa.Code § 63.4 (July 1988). An additional condition of Hill's parole was that he could not use alcohol. App. 424, 431, 563.

her written statement. At that time, she stated that while attempting to secure the store after Hill's arrest, she and her son had discovered a rifle in an unused ice machine and a box containing a large amount of cash and what appeared to be drugs. The parole agents sought and received her permission to retrieve this contraband from the store. Once again the parole agents accompanied Mrs. Hill to the store, which she entered by removing chicken wire from a rear window. Pandolfo followed through the window. Once inside, Mrs. Hill pointed to an ice machine. Pandolfo opened its lid, finding the barrel and stock of a .22 caliber Marlin rifle. Mrs. Hill then pointed to a stack of boxes immediately to the right of the ice machine. These boxes contained 780 vials of cocaine base, 243 packets of cocaine powder, two pounds of marijuana, and over $8,000 in United States currency. Mrs. Hill identified the drugs as those that had been delivered to her husband at the marital home by a dealer named "Jack" several days before. Pandolfo handed these items to Nisenfeld through the window.

Hill was charged with possession of a controlled substance with intent to distribute;[2] possession by a convicted felon of a firearm;[3] and use of a firearm during and in relation to a drug trafficking offense.[4] He moved to suppress all evidence taken from the marital home, the apartment and the store, and to bar his wife's testimony. Both motions were denied. At trial, Mrs. Hill detailed the verbal and physical abuse Hill inflicted upon her in connection with his drug dealing. Hill denied purchasing or selling drugs, and denied owning any guns except the rifles. He claimed he bought the rifles in the early 1970s for hunting purposes, but that his wife planted the Marlin rifle and drugs found in the store.

---

**2.** 21 U.S.C. § 841(a)(1) (1988), provides in part that it is "unlawful for any person knowingly or intentionally ... to ... possess with intent to ... distribute ... a controlled substance."

**3.** 18 U.S.C. § 922(g)(1) (1988), provides in part that it is "unlawful for any person ... who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one

A jury convicted Hill of both counts of possession of a firearm by a convicted felon, one count of use of a firearm during and in relation to a drug crime, and two counts of possession of cocaine with intent to distribute.

## II.

### A. Sufficiency of Evidence of Unlawful Use of Firearm During and in Relation to a Drug Crime

■ Hill contends that the evidence was insufficient to support his conviction for unlawful use of the Marlin rifle found in the ice machine in relation to his illegal possession of cocaine. We must determine whether the record, when viewed in the light most favorable to the government, contains substantial evidence to support the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Reyes,* 930 F.2d 310, 312 (3d Cir.1991). If a rational trier of fact could have found that the government proved beyond a reasonable doubt the essential elements of the crime charged, we must affirm the conviction. *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991); *United States v. Theodoropoulos,* 866 F.2d 587, 593 (3d Cir.1989).

■ Hill maintains that the rifle was not, as a matter of law, used "in relation to" a drug crime. Possession of a firearm constitutes use under 18 U.S.C. § 924(c) where there is evidence "that the defendant intended to have the firearm available for use or possible use during a crime of violence or drug trafficking crime and that the firearm was placed in a spot where it was readily accessible at that time."

year; to ... possess in or affecting commerce, any firearm."

**4.** 18 U.S.C. § 924(c)(1) (1988) provides in part that it is unlawful to use a firearm "during and in relation to any ... drug trafficking crime." Persons convicted of this offense face a mandatory five year sentence.

*Reyes,* 930 F.2d at 313–14.[5] On the other hand, the mere availability of a firearm nearby does not constitute use "in relation to" a drug offense. *Theodoropoulos,* 866 F.2d at 597.

There was sufficient evidence of Hill's use of the gun "in relation to" the predicate drug crimes of which he was convicted. Mrs. Hill found the Marlin rifle in the ice machine on March 13, 1989. The rifle stock was separated from the barrel, but the rifle was operable. It was not loaded, however, and no ammunition was found on the premises. Immediately next to the ice machine was a box containing drugs and cash. These drugs had been delivered to Hill's home several days earlier. Hill told his wife that he was going to sell the drugs from the store, and asked her to join him. According to Mrs. Hill, Hill routinely carried guns for protection. Agent Pandolfo saw both the Marlin rifle and the drugs in the chicken store, the site of at least some of the predicate drug transactions.

This evidence permits the conclusion that Hill (1) possessed the drugs found at his store and intended to distribute them; (2) placed the rifle near his drugs and cash so he could get it quickly and efficiently; and (3) intended to have the gun available for protection during drug transactions conducted at the store. The jury could have reasonably inferred from these facts that Hill used the rifle in relation to his illegal possession of controlled substances.

Hill contends that his conviction was improper because the rifle was hidden, unloaded, and disassembled, and because no ammunition was found at the scene. Hill relies upon *Theodoropoulos,* where we rejected the view that "the mere availability of a firearm nearby, as distinguished from

its *open display,* is equal to use 'in relation' to an offense." 866 F.2d at 597 (emphasis added). We agree with the government that *Theodoropoulos* is distinguishable from the present case, and does not require proof of open display.

In *Theodoropoulos* the defendant had been charged with using four different firearms in connection with conspiracy to distribute cocaine and possession of cocaine with intent to distribute. One of these weapons, a shotgun, had been found in an apartment where the police had also discovered cocaine. *Id.* at 589. The other three guns—two loaded pistols and a disassembled machine pistol—were found in a trash can on the back porch of the apartment along with ammunition. *Id.* at 595. We found that the jury could have concluded that the shotgun was in use during and in relation to the predicate offense, but also held that the guns found on the porch did not satisfy § 924(c)(1). *Id.* at 598.[6]

As we recently explained, our holding in *Theodoropoulos* turned on the fact that the three guns were merely "nearby" or "near" the locus of the underlying offense. *United States v. Reyes,* 930 F.2d at 314. In these circumstances, the guns could not reasonably be found to have been used in relation to the drug conspiracy because the evidence "did not establish their proximity to the defendant ... [or] show that the defendant had easy means of access to the weapons during drug-related transactions." *Id.* Here, by contrast, the evidence showed that Hill's rifle, although hidden in an unused icebox, was located immediately next to the drugs. Moreover, Hill's access to the weapon was unimpeded by distance or other objects. To put his hands on the rifle

---

**5.** In *Theodoropoulos* we adopted the test in *United States v. Feliz–Cordero,* 859 F.2d 250 (2d Cir. 1988), i.e., that possession of a firearm constitutes "use" under § 924(c) if there is:

i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as

to be quickly and easily available for use during such a transaction.

866 F.2d at 597 (quoting *Feliz–Cordero,* 859 F.2d at 254).

**6.** Because the jury had not specified which of the four weapons was the basis for conviction, we could not exclude the possibility that the jury convicted the defendant based solely on one of the weapons found on the porch. For this reason, we vacated the conviction and remanded for a new trial with regard to the shotgun found in the apartment. *Id.*

during a drug transaction, he simply had to reach out and open the icebox. In light of the close proximity of the rifle to Hill's illegal drugs, as well as his easy access to the weapon, we hold that the mere concealment of the rifle would not prevent a reasonable trier of fact from concluding that it facilitated Hill's possession of and intention to distribute cocaine and cocaine base.

Hill also contends that his conviction under § 924(c)(1) cannot be sustained because the rifle was unloaded. We disagree. As the Court of Appeals for the Tenth Circuit has pointed out, "[u]nloaded firearms have the same effect on victims and observers when pointed or displayed, tending to intimidate, and also increase the risk of violence by others who may respond to the perceived danger represented by the (presumably) loaded gun." *United States v. Martinez,* 912 F.2d 419, 421 (10th Cir.1990). Section 924(c) was intended "to impose more severe sanctions where firearms facilitated, or had the potential of facilitating, the commission of a felony." *United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985). Hill's rifle, even if unloaded, still had the potential to facilitate his unlawful possession of cocaine. *See also United States v. Munoz–Fabela,* 896 F.2d 908, 911 (5th Cir.) (conviction under § 924(c) upheld even though firearm present at drug trafficking scene was unloaded), *cert. denied,* —— U.S. ——, 111 S.Ct. 76, 112 L.Ed.2d 49 (1990); *United States v. Coburn,* 876 F.2d 372, 375 (5th Cir.1989) (unloaded shotgun); *United States v. York,* 830 F.2d 885, 891–92 (8th Cir.1987), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988) (nonfunctioning weapon); *United States v. Gonzalez,* 800 F.2d 895 (9th Cir.1986) (unloaded gun). For the same reasons, we also reject Hill's argument that his conviction must be vacated because there was no ammunition in the store.

Finally, Hill appears to argue that the rifle could not have been used in relation to his illegal drug possession because its stock, when found, was separated from its barrel. We disagree. The evidence showed that the gun was capable of use, even in this state. Hill concedes in his brief that the weapon was fully operational. Moreover, as parole agent Pandolfo discovered during his search of Hill's chicken store, the two pieces could be screwed together quickly. The "broken" status of the gun therefore does not alter our conclusion that a reasonable jury could find that it was used in relation to a drug crime.[7]

### B. *Warrantless Search*

Hill contends the March 14 warrantless search of the chicken store was unreasonable under the Fourth Amendment, and the evidence seized should have been suppressed. At the suppression hearing it was established that on March 13, Mrs. Hill told the parole agents that Hill had threatened and beaten her, had consumed alcohol, and kept a gun in the marital home. Any one of these allegations, if proved, would have constituted a parole violation. Also, during the March 13 search of the marital home, the agents discovered three rifles, a loaded handgun, and eight packets of cocaine. Mrs. Hill told the agents that these items belonged to her husband. In a search of Hill's apartment on the same day, the agents discovered two handguns. On March 14, Mrs. Hill informed the agents that she and her son discovered a Marlin rifle and more drugs in the store. After hearing this, the agents accompanied Mrs. Hill to the store and conducted the challenged search. Hill concedes that the March 13 warrantless searches of his home and apartment were legal, but argues that the district court should have suppressed the fruits of the

---

**7.** Hill also suggests that a conviction under § 924(c) is invalid when, as here, the relevant weapon is found after the defendant's arrest and incarceration. Hill has not cited any authority for this proposition. In *Theodoropoulos* we alluded to the fact that the guns were not discovered by the FBI until after the defendants were in custody. 866 F.2d at 597. *Theodoropoulos,* however, hinged on the proximity and availability of the weapons to the defendants, not the fact that the defendants were incarcerated when the guns were found. At trial, Hill contended that his wife planted the gun and drugs in the store after his arrest. The jury rejected this defense.

March 14 search. We agree with the district court that the second search was proper.[8]

In an analogous case, *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Supreme Court held that a probation officer's warrantless search complied with the Fourth Amendment because he followed Wisconsin statutes and regulations. We recognize that in *Griffin* the searches were conducted under a particular regulatory scheme and here no specific statutory or regulatory provision authorized Hill's parole agents to conduct the warrantless search of his store.[9] Nevertheless, we find the Court's reasoning germane.

In *Griffin*, the supervisor of Griffin's probation officer received a tip from a police officer that guns "were or might be" in Griffin's apartment. 483 U.S. at 871, 107 S.Ct. at 3167.[10] With the assistance of another probation officer and three police officers, the supervisor conducted a warrantless search of the apartment, which yielded a prohibited handgun. Griffin was charged with possession of a firearm by a convicted felon under Wisconsin law. *Id.* at 872, 107 S.Ct. at 3167.

In *Griffin*, state law subjected probationers to "conditions set by the court and rules and regulations established by the department." *Id.* at 870, 107 S.Ct. at 3167. With supervisory approval, a probation officer could search a probationer's home without a warrant when there were "reasonable grounds" to believe contraband was present, including any item forbidden by the conditions of probation. *Id.* at 870–71, 107 S.Ct. at 3166–67. The regulations provided that the officer should consider several factors when making this determination, including information provided by an informant, the reliability and specificity of that information, the reliability and possible bias of the informant, the officer's own experience with the probationer, and the need to verify compliance with the rules of supervision and state and federal law. *Id.* at 871, 107 S.Ct. at 3167. Further, it was a violation to refuse to consent to a home search or to possess firearms without approval. *Id.* at 871, 107 S.Ct. at 3167.

The Supreme Court held that the search of Griffin's apartment did not violate the Fourth Amendment, but declined to hold, as had the Wisconsin Supreme Court, that *any* search of a probationer's home by a probation officer satisfies the Fourth Amendment so long as the information possessed by the officer satisfies a "reasonable grounds" standard. *Id.* at 872, 107 S.Ct. at 3167. The Court held that although all searches of probationer's homes must be reasonable under the Fourth Amendment, there are exceptions to the warrant and probable cause requirement where "special needs, beyond normal law enforcement, make the ... requirement impracticable." *Id.* at 873, 107 S.Ct. at 3168. In the Court's view, the probation system presents such special needs because probation, a form of punishment, necessarily involves restricted liberty. Probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.' " *Id.* at 874, 107 S.Ct. at 3169 (paraphrasing *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)) (bracketed text in original). These restrictions are intended to ensure fulfillment of the twin goals of the probation system: rehabilitation of the probationer and pro-

---

**8.** Our review of whether the search violated Hill's Fourth Amendment rights, a mixed question of law and fact, is plenary. *United States v. Ezeiruaku*, 936 F.2d 136, 139 (3d Cir.1991).

**9.** There is no evidence that Hill expressly agreed to warrantless searches, *see United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir.1990); *United States v. Schoenrock*, 868 F.2d 289, 292–93 (8th Cir.1989), or that warrantless searches were an express condition of Hill's parole. *See* 37 Pa. Code § 63.4(6) (1988) (referring to "the Conditions Governing Parole/Reparole form"). *See also Shea v. Smith*, 966 F.2d 127 (3d Cir.1992).

**10.** For a discussion of *Griffin* and its effect on the Wisconsin probation system, see Howard P. Schneiderman, *Conflicting Perspectives from the Bench and the Field on Probationer Home Searches—Griffin v. Wisconsin Reconsidered*, 1989 Wisc.L.Rev. 607 (1989).

tection of the public. *Id.* 483 U.S. at 868, 107 S.Ct. at 3164. The supervision required to assure these restrictions are observed is, therefore, a special need permitting "a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875, 107 S.Ct. at 3169.

The Court then explained that the special needs of Wisconsin's probation system made the warrant requirement "impracticable" and justified replacement of the probable cause standard with the regulation's "reasonable grounds" test. *Id.* at 876, 107 S.Ct. at 3170. A warrant requirement would, the Court reasoned, interfere by making a magistrate rather than the probation officer the supervisor of a particular probationer; introduce delay that would slow the response of probation officials to evidence of misconduct and "reduce the deterrent effect that the possibility of expeditious searches would otherwise create"; and interfere with the development and maintenance of the counseling relationship of probation officer to client. *Id.* at 876–77, 107 S.Ct. at 3169–70. In this setting, it was reasonable to dispense with the warrant requirement.

The Court also held that a probable cause requirement would disrupt the probation regime by reducing the deterrent effect of supervision because the probationer would "be assured that so long as his illegal (and perhaps socially dangerous) activities were sufficiently concealed as to give rise to no more than reasonable suspicion, they would go undetected and uncorrected." *Id.* at 878, 107 S.Ct. at 3171. Moreover, the relationship of probation officer to probationer is "not entirely ... adversarial." *Id.* A probable cause requirement would divert the officer's attention from his client's individual characteristics and needs, and would interfere with appropriate supervision. *Id.* at 878–79, 107 S.Ct. at 3170–71. Particularly where drugs and guns are involved, it is "both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon" a showing of probable cause. *Id.* The probation agency must "intervene before the probationer does damage to himself or society" and be able to proceed "on the basis of its entire experience with the probationer, and to assess probabilities in light of its knowledge of his life, character, and circumstances." *Id.*

*Griffin's* reasoning applies equally to the parole system. As the Supreme Court explained, parolees enjoy "only conditional liberty properly dependent on observance of special ... restrictions." *Griffin,* 483 U.S. at 874, 107 S.Ct. at 3169 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). Parole, like probation and incarceration, is "a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." *Id.* 483 U.S. at 874, 107 S.Ct. at 3168.

> The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts.

*Morrissey,* 408 U.S. at 483, 92 S.Ct. at 2601. Therefore, there is "no constitutional difference between probation and parole for purposes of the fourth amendment." *United States v. Harper,* 928 F.2d 894, 896 n. 1 (9th Cir.1991). *Cf. Commonwealth v. Green,* 405 Pa.Super. 24, 591 A.2d 1079, 1082 (1991) (*Griffin* analysis is "germane to a parole setting"), *cert. denied,* — U.S. ——, 112 S.Ct. 1571, 118 L.Ed.2d 215 (1992). In fact, parole may be an even more severe restriction on liberty because the parolee has already been adjudged in need of incarceration. *See United States v. Cardona,* 903 F.2d 60, 63 (1st Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991). For this reason, the "special needs" of probation would appear to be heightened for parole. *Harper,* 928 F.2d at 896 n. 1.

In many respects, this case is like *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir.), *cert. denied,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975), a habeas corpus case.

In *Latta,* the Court of Appeals for the Ninth Circuit upheld a warrantless search of parolee Latta's home, even though (1) no statute, regulation, agreement, or condition of parole authorized the search, (2) the parole officers who conducted the search were accompanied by two local police officers, (3) a relative had to let the officers into Latta's house, and (4) Latta had been arrested six hours before the search and was thirty miles from home when it occurred. The search turned up a four-and-one-half pound brick of marijuana, which was the basis of Latta's conviction for possession of marijuana with intent to distribute.

Holding that the search did not violate Latta's Fourth Amendment rights, the court acknowledged that parole searches must be reasonable, but found that the parole agent was not required to have probable cause. *Id.* at 249. The court pointed out that the main goal of parole is to provide for supervised rehabilitation outside of prison. *Id.* However, parole should also deter recidivism. *Id.* For these reasons, parole authorities have a "special and unique interest in invading the privacy of parolees under their supervision." *Id.* This interest in turn requires the officer to have a "thorough understanding of the parolee and his environment, including his personal habits, his relationships with other persons, and what he is doing, both at home and outside it." *Id.* Such an understanding is acquired only by "conducting some type of search." *Id.* at 250. And while a parolee's reasonable expectation of privacy is greater than a prisoner's, it is still less than the average citizen's. *Id.* In these circumstances, it is reasonable to allow a parole officer to search whenever he reasonably believes that it is necessary to perform his duties. *Id.* The decision to search must be based on "specific facts," but the officer need not possess probable cause.

The court held that a search warrant was not required because the relationship between the parole officer and his parolee is "special" and *"sui generis* so far as the warrant requirement is concerned." *Id.* at 250–51. For this reason, "such searches

must be governed by unique, separate, and distinct rules." *Id.* at 251. The court then noted that its decision not to impose a warrant requirement was consistent with the Supreme Court's decision not to require a warrant in administrative search cases. Those decisions, noted the court, were justified by pervasive regulation of the person or premises to be searched; express statutory authorization of, or "long standing judicial authority" for, such searches; a diminished expectation of privacy; and the need for "unannounced and frequent" searches. *Id.* All of these conditions prevailed in parole, so a parole officer need not obtain a warrant before searching his client's home.

We believe that in light of the parole system's special needs, the search of Hill's store was reasonable under the Fourth Amendment. When the authorities arrested Hill, they discovered drugs and guns. As was true in *Griffin* and *Latta,* the decision whether to terminate parole hinged primarily on whether and to what extent Hill used or distributed drugs and weapons. *Griffin,* 483 U.S. at 879, 107 S.Ct. at 3171; *Latta,* 521 F.2d at 252. In deciding whether to revoke parole, the parole board would "need to know the number and seriousness of all violations, as well as other current information about the parolee's progress." *Latta,* 521 F.2d at 252 (citing *Morrissey v. Brewer,* 408 U.S. at 479, 92 S.Ct. at 2599). *Cf.* 61 Pa.C.S. § 331.19 (Purdon Supp.1991) (parole board has duty to investigate circumstances of offense and parolee's "character, mental characteristics, habits, antecedents, connections, ... environment, ... physical, mental, and behavior condition and history, ... history of family violence and ... complete criminal record"); § 331.21 (Purdon Supp. 1991) (requiring parole board to evaluate the "probability that the convict will be benefitted by again according him liberty"); § 331.21a (Purdon Supp.1991) (parole board has discretion to "reparole whenever, in its opinion, the best interests of the prisoner justify or require his release on parole and it does not appear that the interests of the Commonwealth will be injured thereby").

Hill asserts that the search was conducted to further a criminal prosecution rather than to supervise him. He contends that once he was arrested on March 13, society's interests in protection and rehabilitation were "highly diminished or non-existent." Appellant's Brief at 26. The parole agents, argues Hill, had no immediate need to conduct the second search. They did so, he asserts, "merely to seize evidence to provide to the police." *Id.* at 27. For this reason, Hill maintains, the parole officers became "stalking horses" for the police. *Id.; see Shea v. Smith*, 966 F.2d 127, 132 (3d Cir.1992). We disagree.

We note that the search of the store was prompted by Mrs. Hill's report that she had found the gun and drugs, not by a police tip. Once Nisenfeld and Pandolfo heard that Hill may have committed further parole violations, they were duty-bound to investigate whether these allegations were true. No police were present before or during the event. There was no evidence that the agents acted on behalf of the police. In sum, nothing in the record suggests that the agents were doing anything other than verifying another allegation that Hill had violated the terms of his parole.

Hill's "stalking horse" argument is also undercut because the parole agents' "interest in inspecting [Hill's] place of residence did not terminate upon his arrest; if anything, it intensified." 521 F.2d at 252. The evidence seized during the search bore directly upon his potential for rehabilitation, and would figure prominently in decisions on the need for further incarceration. The agents investigated whether there was physical evidence of parole violations. This

evidence was not likely to be found elsewhere. Moreover, taking Hill from the streets did not eradicate the danger: he left a gun and drugs behind. It was within Nisenfeld's and Pandolfo's normal duties to ensure that Hill's activity posed no lingering threat to public safety. We cannot say in these circumstances that the needs of the parole system had been fulfilled by the time of the second search, or that the agents had "switched hats" and become "stalking horses" for the police.[11] Therefore, the March 14 search of Hill's store was reasonable under the circumstances and did not violate his Fourth Amendment rights.

## C. *Applicability of Marital Communications Privilege*

 Hill's final argument is based on the "marital communications" privilege that prevents a testifying spouse from "disclosing confidential communications between the spouses." *United States v. Ammar*, 714 F.2d 238, 258 (3d Cir.) *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).[12] This privilege may be invoked by the non-testifying spouse, *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir.1990), but only under certain conditions. A major limitation is that "where marital communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege." *United States v. Broome*, 732 F.2d 363, 365 (4th Cir.) *cert. denied*, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 116 (1984). *See also Ammar*, 714 F.2d at 257–58.[13] In

---

**11.** Because we hold that the March 14 search of Hill's store was reasonable under the circumstances, we need not address the district court's alternative holding that Mrs. Hill had consented to the search.

**12.** Because Mrs. Hill testified voluntarily, she waived her privilege to decline to testify against her husband. *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

**13.** This exception
reflects the balancing between public interests in fostering open and honest communications between husband and wife and according a sufficient degree of privacy to marital rela-

tionships, on the one hand, and the revelation of truth in the attainment of justice, that also are in the public interest, on the other.... This exception reflects the belief that the greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would come from permitting the accused to erect a roadblock against the search for truth.
*United States v. Parker*, 834 F.2d 408, 411 (4th Cir.1987).
The privilege extends only to utterances, not acts. *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954). "Testimony

particular, Hill asserts the privilege with respect to his wife's testimony regarding their conversations about (1) a confrontation she had had with a neighbor;[14] (2) a drug delivery;[15] and (3) what Hill would do with the proceeds of his illegal conduct.[16]

The admissibility of this testimony is governed by Mrs. Hill's role in Hill's criminal activity. Before Mrs. Hill contacted the parole authorities, she accepted deliveries of drugs, informed Hill of these deliveries, and counted drug proceeds. Even though she was not prosecuted for her role in Hill's activities, she was at times a "joint participant" in them. *See United States v. Parker,* 834 F.2d at 412 (policies behind the "joint criminal participation" exception to the privilege are concerned with actual participation, not prosecution). Her later cooperation with the authorities does not alter this fact. We conclude that the marital communication privilege was not violated here.

### III.

For the reasons stated, we hold that there was sufficient evidence that Hill used the Marlin rifle "in relation to" his unlawful possession of cocaine; that the warrantless search of his store did not violate his Fourth Amendment rights; and that the marital communications privilege was not violated by his wife's testimony. We will affirm Hill's convictions.

---

concerning a spouse's conduct can be precluded upon the spouse's challenge only in the rare instances where the conduct was intended to convey a confidential message from the actor to the observer." *United States v. Estes,* 793 F.2d 465, 467 (2d Cir.1986). Moreover, the privilege is inapplicable where a third party is present during a communication between spouses, because that person's presence "negatives the presumption of privacy." *United States v. Parker,* 834 F.2d at 411.

**14.** Mrs. Hill testified that she told her husband that a woman had threatened to call the police

if Hill didn't stop selling drugs to neighborhood children. He reacted by telling Mrs. Hill to stop interfering in his efforts to make money, and by beating her.

**15.** Mrs. Hill testified that she told her husband that someone had left a package for him. Hill instructed her to leave it alone until he got home.

**16.** Mrs. Hill testified that while he was counting money, he once told her he was going to "make it big," and would need her no more.