The Court will deny the CM's Motion to Dismiss the Amended Complaint, or in the alternative, to Transfer to the Eastern District of New York for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Anheuser-Busch, Incorporated's Motion to Dismiss the Amended Complaint [# 20–1] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Anheuser-Busch, Incorporated's Motion to Transfer to the Eastern District of New York [# 20–2] is **DENIED.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**Lynn J. REPLOGLE, Defendant.**

**No. 4:01CR121.**

United States District Court,
D. Nebraska.

Sept. 13, 2001.

Nancy A. Svoboda, Assistant U.S. Attorney, Omaha, NE, for Plaintiff.

John M. Lefler, Lincoln, NE, for Plaintiff.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the Magistrate Judge's Recommendation (filing 30) that Defendant's motion to suppress (filing 12) be denied and the objections to the Recommendation (filing 31), filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the Recommendation. Inasmuch as Judge Piester has fully, carefully, and correctly applied the law to the facts, I need only state that the Recommendation should be adopted, Defendant's objections to the Recommendation should be denied, and Defendant's motion to suppress should be denied.

Accordingly,

IT IS ORDERED:

1. The Magistrate Judge's Recommendation (filing 30) is adopted;

2. The defendant's objections to the Recommendation (filing 31) are denied; and

3. The defendant's motion to suppress (filing 12) is denied.

## MEMORANDUM, ORDER AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

This matter is before this court on defendant Lynn J. Replogle's motion to suppress. Filing 12. On July 24, 2001 a hearing was held before me on this motion. For the reasons set forth below, I shall recommend that defendant's motion to suppress be denied in its entirety.

## BACKGROUND

On December 23, 1999 defendant was placed on a two-year probation period after he was convicted of attempted possession of methamphetamine. Because defendant was attending school in Beloit, Kansas until May 2000, and after that, his employment in Beatrice, Nebraska required him to travel out of town and work long hours, the conditions of his probation stated that he had to report to his probation officer in writing. Defendant's probation officer, Gary Pinkerton, testified that defendant reported regularly until December 2000, but then failed to report for the next three months in violation of his probation order. In March 2001 Pinkerton attempted to make contact with the defendant by calling his parents. She talked to his parents over the phone and visited their home, but was not able to contact the defendant. Pinkerton did not record her attempts to make contact with the defendant and did not take action to revoke or change the terms of defendant's probation.

On or approximately March 26, 2001 Investigator Ernest Reiss of the Southeast Area Drug Enforcement ("S.E.A.D.E.") Task Force received information from Aaron P. Byrne from the Beatrice Police Department (BPD), that two female juveniles in Lincoln, Nebraska had received drugs from the defendant in Beatrice. Byrne had in turn received this information from a counselor in Blue Valley Mental Health. The teenagers provided this information on the condition that they not have to speak to the police. They did not give an address or specific location of where they received the drugs, but described a house that looked run-down and abandoned. One of the teenagers also stated that the house was next to her grandfather's house. The investigators did not do anything to verify the reliability or veracity of the information.

With this information, Reiss determined that the house described by the teenagers was probably 515 West Milliken, which was owned by defendant's father, Gregory Replogle. The next day, Reiss contacted Pinkerton to ask about the conditions of defendant's probation. He was informed that defendant's reported address was 1821 South 2nd, which was his parents' residence. However, defendant's driver's history stated that he lived at 515 West Milliken. Because of a search clause in defendant's probation terms, Reiss began to conduct surveillance of 515 West Milliken, and later of 1821 S. 2nd, from March 27, 2001 through April 5, 2001 to establish which of those two addresses was the defendant's residence. According to Reiss' and Pinkerton's testimony, the surveillance revealed that the defendant's vehicle was parked at 515 West Milliken on several occasions, and they concluded—erroneously, as it turns out—he must have been living there. Pinkerton promptly consulted with a judge whether she could make a "home visit" and conduct a search under the terms of the probation. She was informed that she could.

Defendant's father testified that the defendant did live at the Milliken location from November 14, 2000 to January 18, 2001, but had moved back to 1821 South 2nd because he had lost his job and could not pay his bills. He also stated that during the pertinent time, he asked the defendant to effect some repairs to the Milliken property to prepare it for sale. Defendant's mother, Elizabeth Replogle, testified that the defendant had most of his clothes and personal property in their residence and that he slept there "most nights" after he moved back.

The morning of April 6, 2001 Pinkerton and Peggy Adam, another probation officer, accompanied by two investigators of the S.E.A.D.E. Task Force, two officers and a captain of the Beatrice Police Department, and a deputy sheriff drove to 515 West Milliken to contact the defendant and search the premises pursuant to defendant's probation order. As they arrived to the location, they observed two females leaving the house. Pinkerton and Adam asked them whether the defendant was inside the house and the women responded he was. They then requested the two females to stay. Pinkerton and Adam, along with the two females and Investigator Michael Oliver, approached a door located on the east side of the property and began knocking. When they did not get an response, Adam called out defendant's name and told him to come out. Once again they did not get a response. Pinkerton then asked one of the females to go inside the property to tell the defendant to come out. The female went in the house, partially closing the door behind her, and came out a few minutes later. The defendant approached the door shortly thereafter.

Pinkerton explained to the defendant that they were there for a home visit. There is conflicting evidence as to whether defendant freely and voluntarily allowed Pinkerton, Adam, and Investigator Oliver to enter the house. Pinkerton testified that defendant asked, "Why the cops?," and then just stepped aside and allowed them to go in the house. However, on cross-examination Pinkerton admitted that in a letter to Captain Fitzgerald of the BPD she had stated that the defendant "objected momentarily to [their] entering the residence." She also admitted that she did not ask for defendant's consent to enter the house, because she "did not have to ask for his consent" as the probation order gave her the authority to search the house. Oliver and Adam's testimony attested that defendant was agitated and was reluctant to let them in the house with Investigator Oliver. Oliver stated that when defendant asked Pinkerton why he

was with them, Oliver tried to calm him down by putting his hand on his shoulder and telling him he was there because probation had requested his assistance.

Once inside the house, Pinkerton advised the defendant she needed to get a urine sample from him. Defendant went in the bathroom with Investigator Oliver to provide the urine sample. At about this time, Pinkerton and Adam observed a pipe and marijuana on a coffee table in the livingroom. Once the urine specimen was obtained, defendant and the probation officers stepped outside the house. While he was talking to Pinkerton and Adam he asked if he could go back inside to retrieve his hat and his cell phone. Pinkerton accompanied him inside the house. When they came out, Pinkerton advised the defendant that a search of the house would be conducted and that he could leave. Defendant left the scene shortly thereafter.

The search of the house was conducted by the officers of the BPD and the deputy sheriff with her drug dog. While Pinkerton and Adam looked in some cabinets in the kitchen and inside the refrigerator, they, for the most part, passively observed and left the house before the search was completed. As a result of the search, the officers found approximately fifty six (56) grams of a substance that later tested positive for methamphetamine, syringes, a scale, and other drug paraphernalia. *See* Government's Exhibit 3 through 9. Most of these items were inside a gray fireproof box that was stored in a storage compartment under a waterbed. *See* Government's Exhibit 2. Although there was no immediate arrest, defendant was ultimately arrested after his indictment.

## DISCUSSION

Defendant raises a number of arguments to contest the constitutional validity of the search of the 515 West Milliken residence. I shall address each separately.

### LEGITIMATE EXPECTATION OF PRIVACY

Defendant argues that although he did not reside at 515 West Milliken, he still had a legitimate expectation of privacy inside the property. I agree.

 An individual has a legitimate expectation of privacy where he can demonstrate (1) a subjective expectation of privacy, and (2) that the subjective expectation is one that society is prepared to recognize as objectively reasonable. *United States v. Muhammad,* 58 F.3d 353, 355 (8th Cir. 1995). Factors relevant in an expectation-of-privacy determination are: whether the party has a possessory interest in the place searched; whether the party has the ability to exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party has a key to the premises. *United States v. McCaster,* 193 F.3d 930, 933 (8th Cir.1999) (citing *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)).

 The defendant clearly had sole possession and control of the house in this case because of the fact that he had the only key to the premises. Also, because he had the only key to the house, the defendant had the ability to exclude others from the property. Additionally, there is no evidence that defendant did not take precautions to maintain his privacy inside the house. In fact, the evidence shows that when the officers arrived at the scene, the door was closed and they had to knock to get the defendant to open. Furthermore, when the officers asked one of the females they observed leaving the house to go inside and call the defendant, the female partially closed the door behind her as she entered the house. Therefore, I

conclude the defendant had a reasonable expectation of privacy in this property.

### FAILURE TO OBTAIN A SEARCH WARRANT

Defendant also argues that the search was conducted in violation of the Fourth Amendment because there was neither a warrant nor any exceptions excusing the failure to obtain a warrant to search the residence. While defendant's statements are correct, the officer's failure to obtain a warrant is of no effect in this case since the evidence clearly shows that the search was conducted pursuant to defendant's probation order and nothing else.

### PROBATION ORDER DID NOT AUTHORIZE THE SEARCH

1. *No Ownership, Possession, or Control of 515 West Milliken*

Defendant's next claim is that a search pursuant to his probation order was not valid for several reasons. First, he argues that there was no authority to conduct a search because he did not own, possess, or control 515 West Milliken on April 6, 2001 as required by the order of probation.[1] I disagree.

■ Although defendant may not have resided at, and did not own, 515 West Milliken at the time of the search, the evidence shows that he had possession and control of the property. Defendant's father, Gregory Replogle, testified that he asked the defendant to do some repairs to the house in order to prepare it for sale. To effect these repairs, Mr. Replogle gave the defendant the only keys he had to the house so that he could access the house at any time of the day. This clearly gave the defendant sole control and possession of the property. In order for others to gain access inside the house, including his father, the owner, they would have to ask the defendant to either release the keys or to open the doors for them. Other evidence of defendant's control and possession of the property includes defendant's personal possessions in the property, including a couch, a lounge chair, a television, coffee table, dresser, and bed, the beer he had in the refrigerator, and, as evidenced from the two women leaving the property the day of the search, the fact that he entertained guests in the house. Thus, I conclude this argument lacks any merit.

2. *No Consent to Enter or Search the Property*

Defendant next argues that the officers did not have the authority to search the house under the probation order because he did not consent to either the officers entering the house or to the search. Although Pinkerton stated that defendant

---

1. Defendant's order of probation provides in part that the defendant shall:

 1. Not violate any law of the State of Nebraska or any other state or any Federal law or any city or village ordinance.
 2. Report to the Probation Officer as directed and allow the Probation Officer to visit you at your residence or elsewhere.
 . . .
 4. Not consume nor have in your possession any alcohol or controlled substance nor be in any place where a controlled substance is being used without a doctor's prescription.

 5. Submit to a blood breath or urine test whenever requested to do so by the Probation Officer and pay the cost thereof.
 . . .
 10. Consent to the search of your person or any real estate or property including motor vehicles owned by you or under your control or possession, at any time, by the Probation Officer or law enforcement officer acting under the direction of the Probation Officer. . . .

 *See* Government's Exhibit 1.

first asked, "Why the cops?," and then freely stepped aside and allowed them to go in the house, I conclude the bulk of the evidence supports defendant's argument that he did not give a free and voluntary consent. First, Pinkerton herself admitted that she did not even request defendant's consent to either enter or search the property. Secondly, there is ample evidence, including from Pinkerton, that defendant was reluctant to let the officers in the house. In fact, it seems that the defendant allowed the officers in the house without any objections only after Investigator Oliver approached him and put his hand on defendant's shoulder to "calm him down."

A consent to search is voluntary "if it [is] 'the product of an essentially free and unconstrained choice by its maker,'" rather than "'the product of duress or coercion, express or implied.'" *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir. 1990) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). In determining voluntariness the court may analyze such relevant factors as the following:

> [T]he age of the individual giving consent; his [or her] general intelligence and education; whether [this individual] was under the influence of a mind-altering substance; whether he [or she] was informed of his [or her] right to withhold consent or of his [or her] Miranda rights, the length of time he [or she] was detained or questioned, whether he [or she] was threatened physically, intimidated or punished by the police; whether he [or she] relied upon promises or misrepresentations by the police; whether he [or she] was in custody or under arrest when the consent was given; whether he was in a public or secluded location; and whether he objected to the search or passively looked on.

*Chaidez,* 906 F.2d at 381. "Thus, consent is involuntary when 'under all the circum-

stances it ... appear[s] that the consent was ... granted only in submission to a claim of lawful authority.'" *United States v. Larson,* 978 F.2d 1021, 1023 (8th Cir. 1992) (quoting *Bustamonte,* 412 U.S. at 233, 93 S.Ct. at 2051).

■ The evidence in this case shows that the defendant allowed the officers to enter the property and then to search it only in submission to Pinkerton's claim of authority pursuant to the probation order. Such submission is not enough to amount to a voluntary consent. Furthermore, given the number of law enforcement operatives outside the house at the time, some in uniform and weapons exposed, it is hard not to conclude that defendant's acquiescence to the officers was not "the product of duress or coercion."

■ However, Pinkerton's failure to request defendant's consent is not fatal in this case. While the language in the probation order does state that the defendant "shall ... [c]onsent" to a search of his person or any property under his possession or control, I conclude Pinkerton did not need to request defendant's consent to effect the search. First, when asked during cross-examination whether she requested defendant's consent, she stated twice that she did not do so because pursuant to the probation order she was not required to do so. Such belief was not unreasonable since warrantless search clauses not requiring consent are a usual condition in many probation orders.

Second, warrantless search requirements are generally considered reasonable. The Eighth Circuit explained in *United States v. Vincent,* 167 F.3d 428 (8th Cir.1999) that the reasonableness of a warrantless search condition stems from the fact that "[p]rohibitions on violations of the law are not self-executing, and a 'search condition has an obvious relation to public safety in making it easier ... to enforce

prohibitions.' " *Id.* at 431 (quoting *United States v. Kills Enemy,* 3 F.3d 1201, 1203 (8th Cir.1993)). This court stated in *Rowe v. Carson,* 911 F.Supp. 389 (D.Neb.1996) that "[s]ubmission to warrantless searches has been recognized by both the United States and Nebraska supreme courts as a condition which is reasonably related to an offender's rehabilitation." *Id.* at 393.

Nevertheless, defendant still argues that because he did not consent to the search as required by the probation order, Pinkerton could only petition the court to revoke his probation for failing to consent, but could not go further and search the property. I disagree.

Defendant would construe the probation order too narrowly, defeating its purpose. If the probation officer were restrained in her ability to actually search the probationer's residence, all manner of crimes could be conducted by the probationer, and, so long as law enforcement did not have probable cause for issuance of a warrant, the probationer's acts would go undetected. Simply by refusing to "consent," the probationer could thwart the probationary purposes of ensuring that he is living a law-abiding life. No case has been cited or found that gives a probationer such control over his probation officer. To the contrary, probation has been recognized as a conditional liberty during which the probationer is under the supervision— "control," as it were—of the probation officer, not the other way around. To require a probation officer to ask and receive the probationer's consent each time she seeks to monitor the probationer would totally undermine not only the purposes of probation, but also this legitimate incursion on the probationer's privacy, an incursion explicitly found "reasonable" by the Supreme Court. *See Griffin v. Wisconsin, infra; see also United States v. Duff,* 831 F.2d 176, 178–79 (9th Cir.1987) (holding that a probationer's Fourth Amendment rights

were not violated by a urine test conducted by his probation officer despite the fact that the probation order did not specifically provide for it because the probation officer reasonably believed that the search would further the purposes of the probation).

In this case the probation order provides that the defendant shall not violate any laws. The order also provides that the defendant shall allow the probation officer to visit him at his residence or elsewhere and does not state that the officer needs to ask for defendant's consent. Additionally, in this case Pinkerton not only had a reasonable suspicion that the defendant was violating his conditions of probation, but was certain he had done so. Defendant had failed to report to her in three months, in direct violation of his probation, and despite her efforts to contact him through his parents, he had not contacted her. Also, defendant was on probation for a drug offense and there was suspicion that he was involved in a drug offense. Moreover, before visiting the defendant, Pinkerton discussed with a judge whether she could make a "home visit" and effect a search of the premises pursuant to the probation order, and she was advised she could. Therefore, I conclude Pinkerton's search without defendant's consent was reasonable to further the purposes of the probation.

3. *Search was Conducted for Law Enforcement and not Probation Purposes*

Finally, defendant argues that the probation order did not authorize the search of 515 West Milliken because it was conducted for law enforcement purposes and not probation purposes.

The Supreme Court has held that officers may search a person's home without a warrant based on probable cause "when 'special needs, beyond the normal

need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). In *Griffin* the Court explained that such "special need" may be present in work-related searches of employees' desks and offices by government employers and supervisors, searches of some student property by school officials, and searches conducted by government investigators pursuant to a reasonable regulatory scheme. *Id.* at 873–74, 107 S.Ct. 3164 (citing *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *New Jersey v. T.L.O., supra; Camara v. Municipal Court,* 387 U.S. 523, 538, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)). The Supreme Court recognized that a state's operation of a probation system presents, just like its operation of a school, government office or prison, or its supervision of a regulated industry, "'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873–74, 107 S.Ct. 3164.

▮▮▮ Consequently, while a probationer's home, like everyone else's, is protected by the Fourth Amendment against unreasonable searches, states · may closely supervise and impinge on a probationer's privacy to a greater extent because probationers' liberty is conditioned on special restrictions. *Id.* at 874–75, 107 S.Ct. 3164 (quotations omitted). A probationer's home may be searched without a warrant and with less than probable cause and the search will not violate the Fourth Amendment if it is conducted pursuant to either state probation regulations or court findings that satisfy the Fourth Amendment's reasonableness standard. *United States v. Vincent,* 167 F.3d at 430 (citations omitted) (holding that a warrantless search of a probationer's home did not violate the

Fourth Amendment where North Dakota's probation scheme provided for warrantless searches and the sentencing court deemed a warrantless search requirement reasonably necessary to ensure probationer would not commit more crimes); *see also Rowe v. Lamb,* 130 F.3d 812, 814 (8th Cir.1997) (holding that the act of a jail supervisor and corrections officer in giving key to probationer's apartment to probation officer after probationer had been arrested for violating parole for an offense separate from offense underlying probation, did not violate the Fourth Amendment, because the terms of the probation order provided that probationer was subject to warrantless searches of his home at any time by any law enforcement officer).

A number of circuits have held, however, that in order for a probation or parole search to be valid, it must have been done to further probation or parole purposes. Consequently, those courts have held that law enforcement officers cannot utilize state probation or parole officials to carry out warrantless searches which they, acting alone, could not execute without a judicial warrant. *See United States v. Ooley,* 116 F.3d 370, 372 (9th Cir.1997) (holding that a search conducted by police officers is valid only for probation purposes and not as a tactic to avoid the warrant requirement); *United States v. Coleman,* 22 F.3d 126 (7th Cir.1994) (recognizing that federal law enforcement officers cannot use state probation officers to circumvent the warrant requirement); *United States v. Hill,* 967 F.2d 902, 908–09 (3d Cir.1992) (search valid under special needs exception because it was prompted by defendant's wife's report that she found gun and drugs, no police were present, and search was conducted only to verify that defendant had violated his conditions of parole); *Owens v. Kelley,* 681 F.2d 1362, 1368–69 (11th Cir.1982) (stating that "[a]ny search conducted pursuant to the search condition

of probation must, of course, be carried out in a reasonable manner and only in furtherance of the purposes of probation").

The Eighth Circuit has not had the opportunity to apply that rule to a probation search, but it has done so with respect to a parole search. In *United States v. McFarland*, 116 F.3d 316 (8th Cir.1997), *cert. denied*, 522 U.S. 961, 118 S.Ct. 394, 139 L.Ed.2d 308 (1997) the court recognized that "a parole search is unlawful when it is nothing more than a ruse for a police investigation." *Id.* at 318 (citing *United States v. Martin*, 25 F.3d 293, 296 (6th Cir.1994); *United States v. Coleman*, *supra; Shea v. Smith*, 966 F.2d 127, 132 (3d Cir.1992); *United States v. Cardona*, 903 F.2d 60 (1st Cir.1990)). The court further explained that this does not mean parole officers and the police cannot ever work together. It stated that parole and other law enforcement officers may work together "provided the parole officer is pursuing parole-related objectives and is not merely a 'stalking horse' for the police." *Id.* (citing *United States v. Harper*, 928 F.2d 894, 897 (9th Cir.1991)). The Eighth Circuit then went on to conclude that the parole officer in that case authorized warrantless searches by police officers of defendant's residence and storage locker to determine if defendant was violating his parole and, thus, the searches were conducted for parole and not for law enforcement purposes. *Id.* at 318.

■■■■■ Although this case deals with a probation and not a parole search as the *McFarland* case, the standard applied in that case to determine the validity of the search would apply equally to this case since there is no constitutional difference between probation and parole for Fourth Amendment purposes. *See United States v. Hill*, 967 F.2d 902, 909 (3rd Cir.1992) (quoting *United States v. Harper*, 928 F.2d 894, 896 n. 1 (9th Cir.1991)).

However, to the extent that such standard does not recognize the detection and prevention of suspected violations of law as a legitimate probation purpose, it seems to focus too much on who executes the search and their subjective intent, and too little on the privacy interest of the probationer that is being infringed by the search. The cases addressing the standard do not explicitly discuss the role of the common probation condition to "not violate any law" as a legitimate probation interest justifying a non-consensual search.

■■■■■ The *Griffin* decision clearly held that the state can closely supervise and impinge on a probationer's privacy to a greater extent because his liberty is conditioned on special restrictions. 483 U.S. at 874–75, 107 S.Ct. 3164. Such restrictions are formulated either by statute or special court findings to further the goals of probation, which, as recognized by the Eighth Circuit and other courts, are rehabilitation and public protection, *see United States v. Schoenrock*, 868 F.2d 289, 291 (8th Cir. 1989) (citations omitted), and include first and foremost that defendant shall not violate the law. Given that primary condition on a probationer's liberty, and the clear relationship between this defendant's prior drug offense and his suspected activities in violating his probation, I do not think it matters whether a search authorized in a probation order is effected by a probation or law enforcement officer, or both. Even if a police officer's subjective intention is to further a law enforcement goal separate from policing the probationer's compliance with his conditions of probation, that officer would still be advancing the purposes of the probation, because the purpose of the search is the same: to protect the public by preventing further criminal activity by the probationer.

The appropriate focus is not, in my opinion, the subjective purposes held in mind

by those executing the search, but rather, the defendant's expectation of privacy. If it is reasonable for the state to invade the defendant's privacy at all, it makes no difference which "hat" the invader is wearing since the result is the same—the property is searched and inculpatory evidence is seized. Thus, I conclude that it does not make any difference that the search in this case was executed primarily by police officers, or even that they may have had subjective investigative purposes in addition to Pinkerton's legitimate probation purposes.

However, I further conclude that the evidence in this case shows that Pinkerton did not act as the "stalking horse" of the police. Before Investigator Reiss informed her that the defendant could be selling methamphetamine, Pinkerton knew the defendant was in violation of his probation. Defendant had failed to report to Pinkerton for three months, and she had tried unsuccessfully to contact the defendant several times. Also, even though Reiss brought up the subject of whether they should make a "home visit," the visit did not take place until Pinkerton consulted with a judge and he informed her that she could make a home visit and search pursuant to the probation order. Furthermore, it is undisputed that Pinkerton and Adam were present during most of the search of 515 West Milliken and were the ones who initiated contact with the defendant. Although Pinkerton and Adam left before the search was completed, no evidence was presented to show that they relinquished their authority to the police officers at any time or that they were conducting a search for purposes unrelated to the probation.

Consequently, I conclude defendant's claim that the search violated the Fourth Amendment must fail, and shall recommend that defendant's motion to suppress be denied in its entirety.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendants' motion to suppress, filing 12, be denied in all respects.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

**FURTHER, IT HEREBY IS ORDERED,** trial of this matter is set to begin at 9:00 AM on September 17, 2001, or as soon thereafter as the case may be called, with jury selection at the commencement of trial. Trial is scheduled for three (3) trial days.

Dated Aug. 10, 2001.