**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 12 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEROY A. TRUJILLO,

Defendant-Appellant.

No. 04-4074

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:02-CR-503-DKW)**

---

Submitted on the briefs.[*]

Sharon Preston, Salt Lake City, Utah, for Defendant-Appellant.

Paul M. Warner, United States Attorney, District of Utah; Wayne T. Dance, Assistant United States Attorney, District of Utah, Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **HARTZ**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).

A jury convicted the Defendant, LeRoy Trujillo, of one count of possession of a firearm by a convicted felon and one count of possession of ammunition by a convicted felon. Mr. Trujillo appeals the district court's denial of a motion to suppress evidence found in a search of his home. We take jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM**.

I.

A.

In October 2000, Mr. Trujillo was paroled from Utah State Prison. The Utah State Department of Adult Probation and Parole (AP&P) assigned Agent James Hudspeth to supervise Mr. Trujillo's parole. On September 12, 2000, Mr. Trujillo signed a Parole Agreement, which contained a number of restrictions on his liberty. One clause in the Parole Agreement required Mr. Trujillo to "permit agents of Adult Probation and Parole to search my person, residence, vehicle or any other property under my control, without a warrant, at any time, day or night, upon reasonable suspicion to ensure compliance with the conditions of my parole." Supp. Vol. I. Doc. 2 ¶ 5. The parole agreement also required Mr. Trujillo to abide by all federal, state, and local laws and to submit to periodic drug testing.

After approximately one year, indications began to appear that Mr. Trujillo was not in compliance with the conditions of his parole. In November 2001, Mr.

Trujillo submitted a urine sample that tested positive for the use of a controlled substance. Sometime during February or March 2002, Detective Darrell Dain of the West Valley City Police Department (WVPD) contacted Agent Hudspeth to inform him that Mr. Trujillo was under investigation for drug distribution. On April 2, 2002, Trujillo was asked to provide a urine sample at the AP&P office. Instead of providing the requested sample, Mr. Trujillo complained about stomach pain and claimed that he needed to see a doctor. Despite being informed by Agent Hudspeth that failure to provide a sample would be treated as a refusal, Mr. Trujillo did not submit to the test. As of April 2, 2002, Mr. Trujillo was also in violation of his parole for failing to pay restitution to the victims of his prior crimes and for failing to provide documentation of attendance at required therapy sessions.

On April 3, 2002, Agent Hudspeth submitted a parole violation report and a request for an arrest warrant to the Board of Pardons. The warrant request detailed Mr. Trujillo's violation of his parole agreement, citing his failure to submit to urinalysis the previous day, his failure to pay restitution, and his failure to document his attendance at required therapy. The Board of Pardons granted the request and issued a warrant for Mr. Trujillo's arrest. Before executing the warrant, Agent Hudspeth contacted Detective Dain to request assistance in taking Mr. Trujillo into custody, and Detective Dain agreed to the request.

The parties executed the arrest warrant on the evening of April 3, 2002. Prior to arriving at Mr. Trujillo's residence, Agent Hudspeth briefed members of the WVPD on the planned operation. Agent Hudspeth explained the reason the warrant was issued and also said that they would search Mr. Trujillo's residence. The goal of the search was to locate any drugs or weapons that may have been under Mr. Trujillo's control. When Agent Hudspeth and his partner, Agent Jeremy Poor, arrived at the residence they found Mr. Trujillo in his vehicle. The Agents stopped Mr. Trujillo in his driveway, explained their presence, and took Mr. Trujillo into custody. After the arrest of Mr. Trujillo, officers from the WVPD began a search of the residence. During the search, officers found a 9mm handgun, 9mm ammunition, and narcotics paraphernalia.

B.

On August 2, 2002, the grand jury returned a four-count indictment charging Mr. Trujillo with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), one count of being a user and addict of a controlled substance in possession of ammunition in violation of 18 U.S.C. § 922(g)(3), and one count of being a user and addict of a controlled substance in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). Mr. Trujillo moved to suppress the evidence found during the search of his residence.

-4-

On February 5, 2003, the district court held an evidentiary hearing on the motion, and on May 28, 2003 the district court issued a memorandum decision denying the motion. On October 17, 2003, Mr. Trujillo moved to dismiss the third and fourth counts against him on the ground that these counts were redundant, and the district court granted the motion. On October 21, 2003, a jury found Mr. Trujillo guilty on both remaining counts. The district court sentenced Mr. Trujillo to 46 months of incarceration.

II.

Mr. Trujillo makes two arguments on appeal. First, he argues that the warrantless search of his residence violated the Fourth Amendment's prohibition against unreasonable searches and seizures. He contends that his arrest terminated the clause in his parole agreement allowing for searches of his residence on reasonable suspicion. Second, he argues that if the parole agreement remained in effect, there was not reasonable suspicion to support the search of his residence. When reviewing the denial of a motion to suppress we analyze factual matters for clear error and the determination of legal reasonableness de novo. *See United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).

A.

On two occasions the Supreme Court has addressed the effect of parole agreements on the baseline Fourth Amendment requirement of a search warrant

supported by probable cause. In *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987), the Court determined that a Wisconsin probation regulation permitting warrantless searches fell within the "special needs" exception to the warrant requirement.[1] The Court explained that the restrictions placed on probationers serve the twin goals of effective rehabilitation and insulating communities from the potential harm created by recidivism. *Id.* at 875. According to the Court, the effectiveness of diligent supervision in furthering these goals justifies bringing warrantless searches of probationers within the ambit of the special needs exception. *Id.* The Court emphasized that while probationers do not enjoy the same degree of privacy and protection as the general public, law enforcement officers are not completely untethered from the Fourth Amendment when dealing with probationers. *Id.* The Court concluded that because the probation officers conducted the search pursuant to a valid regulation governing the conduct of

---

[1] The difference between a warrantless search pursuant to a probation agreement, such as that at issue in *Griffin*, and a warrantless search pursuant to a parole agreement, such as that at issue in this appeal, is immaterial for purposes of Fourth Amendment analysis. As the Court stated in *Griffin*: "To a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" 483 U.S. at 874. (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)) (alterations in original). *See also United States v. Lewis*, 71 F.3d 358, 361 (10th Cir. 1995) (applying probationer precedent in a case involving a parolee).

-6-

probationers the search satisfied the Fourth Amendment requirement of reasonableness. *Id.* at 880.

The Court revisited this issue in *United States v. Knights*, 534 U.S. 112 (2001). The defendant had signed a probation order requiring him to submit to warrantless searches by a probation officer or law enforcement officer. *Id.* at 114. A sheriff's deputy searched the defendant's residence on suspicion of involvement in a crime rather than in the course of rudimentary probation supervision. A federal district court granted the defendant's motion to suppress on the basis that *Griffin* authorized "probationary" searches without a warrant, but not "investigatory" searches without a warrant. *Id.* at 116. The appellate court affirmed. *Id.* A unanimous Supreme Court reversed, holding that the reason for searching the probationer's residence is inconsequential—if there is a valid probation arrangement authorizing the search and there is reasonable suspicion to support the search then no warrant is required. *Id.* at 121. To explain this holding the Court again emphasized the two purposes of the probation system: the effective rehabilitation of criminals and protecting the public from harm created by recidivism. *Id.* at 120-21. To allow probationary searches without a warrant, but not investigatory searches, would unnecessarily inhibit the government from achieving the second goal. *Id.* Accordingly, the Court refused to recognize the distinction between probationary and investigatory searches of probationers.

*Griffin* and *Knights* establish that probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment. These cases, however, do not speak to Mr. Trujillo's argument regarding the status of the search provision in his parole agreement once he was taken into custody. While the Tenth Circuit has yet to address this question,[2] every other Court of Appeals that has encountered the issue subsequent to *Griffin* has concluded that an arrest does not immediately terminate a search provision in a parole or probation agreement. In *United States v. Jones*, 152 F.3d 680 (7th Cir. 1998), *cert. denied*, 526 U.S. 1059 (1999), the Seventh Circuit confronted a situation almost identical to the case presented here. The defendant, who was on parole and subject to a warrantless search clause, was arrested by the police, and a search of his residence ensued. The defendant argued that once the police took him into custody the reasons articulated by the Court in *Griffin* for extending limited Fourth Amendment rights to probationers no longer applied; there was no need to supervise him because he was under arrest, and while under arrest he did not pose

---

[2] We have encountered this claim before, but have yet to confront it directly. In *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002), the defendant contested the forensic search of his computer, arguing that the search was pursuant to a parole agreement and the agreement was not valid after the law enforcement officers took him into custody. *Id.* at 1203. The Court declined to address this argument because officers procured a search warrant to conduct the forensic analysis of Tucker's computer and there was probable cause to support the search warrant. *Id.*

a continuing threat to society. *Id.* at 685. The Seventh Circuit rejected this argument for a number of reasons. Most persuasively, the court argued that the fact of the defendant's arrest did not eliminate his diminished expectation of privacy and did not entirely curtail the societal risk posed by the contraband in his residence. *Id.* at 686. Consequently, the court concluded that the search clause of the probation regulation remained in effect, legitimating the warrantless search of the defendant's residence. *Id.* at 687; *see also United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) (upholding a parole search after the parolee's arrest on the ground that the officer was carrying out an official responsibility).

Similarly, in *United States v. Hill*, 967 F.2d 902 (3d Cir. 1992), the Third Circuit determined that a warrantless search of a parolee's business one day after his arrest and incarceration did not violate the Fourth Amendment. The court concluded that searching the defendant's place of business, on the basis of reliable information provided by his estranged wife, would further both of the purposes articulated in *Griffin*. By conducting the search that discovered contraband, the parole agents obtained information on the defendant's "potential for rehabilitation" and also removed the threat to public safety posed by the drugs and weapons left behind. *Id.* at 911. For these reasons, the court concluded that the parole agents' "interest in inspecting [the defendant's business] did not terminate on his arrest; if anything it intensified." *Id.* (citation omitted).

Mr. Trujillo forwards two reasons for concluding that the parole agreement was no longer "in effect" once Officer Hudspeth placed him under arrest. First, Mr. Trujillo argues, contrary to the reasoning of our sister circuits in *Jones* and *Hill*, that the purposes of the parole agreement were no longer relevant once he was taken into custody. Mr. Trujillo contends that his arrest vitiates the governmental interests that normally would weigh in favor of a search in the Fourth Amendment reasonableness analysis. Because the governmental interests are minimal, he continues, his "significant" privacy interest in his residence should prevail. This argument is incorrect for at least two reasons.

First, it is not the case that Mr. Trujillo's arrest eliminated the government's interests in supervising parolees and protecting society from the harm posed by recidivism. The state does not supervise parolees out of charity. While there is every hope that a parolee will be able to rehabilitate himself and lead the productive life of a law abiding citizen, not all parolees find their way. Some return to criminal activity, and the government has an ongoing interest in obtaining information about the scope and severity of this activity. With this information the state can determine whether and how to penalize the recidivist. *See Latta v. Fitzharris*, 521 F.2d 246, 252 (9th Cir. 1975)("[A] parole officer's interest in inspecting [a parolee's] place of residence did not terminate upon his arrest; if anything, it intensified. Revocation is not a necessary consequence of a

parole violation . . . In making their decision regarding disposition, the parole authorities need to know the number and seriousness of all violations, as well as other current information about the parolee's progress"). In addition, the state's interest in protecting society from Mr. Trujillo's return to crime remains a valid objective. As recognized in *Jones* and *Hill*, contraband does not cease to be dangerous when law enforcement officers take a parolee into custody. The volatile mixture of drugs and guns is often part of criminal enterprise, and just because the parolee is under arrest does not mean that the contraband ceases to pose a risk of harm to the general public. Accordingly, Mr. Trujillo is incorrect to assert that the government's interests evaporated at the moment of his arrest.

Second, Mr. Trujillo's privacy interest is not "significant." The conditions placed on the liberty of probationers and parolees reduce their privacy rights well below those enjoyed by other citizens. Mr. Trujillo's arrest does not accord him any increased privacy interests; if anything, his arrest further diminishes any right from interference by law enforcement. Thus, a proper weighing of the government's interests in effective supervision and prevention of harm against Mr. Trujillo's privacy interests demonstrates that his arrest has little effect on the calculus. Just as before his arrest, this balance weighs in favor of the government, as the Supreme Court determined in *Griffin* and *Knights*.

Mr. Trujillo next argues that the parole agreement was intended to place conditions on his liberty only so long as he remained free on parole. Once police took him into custody, the argument continues, he lost the liberty of parole and the agreement ceased to operate. While this may be Mr. Trujillo's understanding of the agreement, there is nothing in the text of agreement to suggest that it terminates at the moment a law enforcement officer takes Mr. Trujillo into custody.[3] At trial, Agent Hudspeth testified that Mr. Trujillo technically remained on parole after his arrest because the adjudication of his parole violations was deferred until the resolution of his federal case. Mr. Trujillo complains that if this is the case, authorities could search his residence many months after his incarceration. This assertion may or may not be correct, but it has no bearing on our analysis. To resolve this appeal we need determine only whether the parole agreement remained in effect minutes after Mr. Trujillo's arrest. There is nothing in the parole agreement to suggest that it did not, and, accordingly, we hold that Mr. Trujillo's arrest did not affect the validity of the parole agreement.

---

[3] Indeed, one provision of the agreement requires Mr. Trujillo to "notify [his] parole agent within 48 hours" if he is arrested, Supp. Vol. I. Doc. 2 ¶ 3, a provision which would make no sense if the agreement were intended to terminate at the time of arrest.

B.

Mr. Trujillo argues that even if the parole agreement remained in effect, the WVPD officers lacked reasonable suspicion to support the search of his residence.  Reasonable suspicion requires only a particularized and objective basis for suspecting criminal activity, a lower standard than probable cause, which means "a fair probability that contraband or evidence of a crime will be found." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  To determine whether reasonable suspicion exists, we examine the totality of the circumstances created by the quantity and reliability of the information available to law enforcement officers at the time of the search.  *See United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002).

There were three pieces of information suggesting Mr. Trujillo's involvement with drugs: (1) the failed drug test in November 2002; (2) the refusal to take the drug test the day before the search; and (3) the information supplied by Detective Dain that Mr. Trujillo may be involved in drug dealing.  Looking at the totality of these circumstances, there is little doubt that the law enforcement officers had sufficient information to provide reasonable suspicion.  The failed drug test, although four months old at the time of the search, suggests that Mr. Trujillo had lapsed in his attempt to remain sober.  The refusal to take a drug test the day before the search was an even stronger piece of evidence that Mr. Trujillo

-13-

was in recent violation of the terms of his parole. Failing a drug test and refusing to submit to a drug test are objective indications that a particular defendant is not complying with a parole agreement, and strongly contribute to a finding of reasonable suspicion. *See, e.g., United States v. Loney*, 331 F.3d 516, 522 (6th Cir. 2003) (a series of failed drug tests followed by absconding from subsequent tests provides reasonable suspicion for conducting a search pursuant to parole conditions).

The information provided by Detective Dain also suggested that contraband or evidence of a crime would be found in Mr. Trujillo's residence. While the record contains scant information on the source and nature of the tip, the Supreme Court has determined that the traditional indicia of reliability for tips play a diminished role when it comes to parole and probation searches. In *Griffin*, the Court explained that it would undermine the probation relationship "to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts." 483 U.S. at 879. Because of the unique characteristics of the probation relationship, the Court concluded that "it [is] reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." *Id.* at 879-80 (footnote omitted). Thus, the tip provided by Detective Dain, combined with the problematic drug

tests, provides more than enough information to support the inference that Mr. Trujillo was engaging in criminal activity and that evidence of that activity would be found in his residence.

Finally, Mr. Trujillo argues that even if there was reason to believe that he violated his parole agreement, there was not a sufficient basis to believe that evidence of drug use would be found in his home. This argument fails on its own terms. Once there was reason to believe that Mr. Trujillo violated his parole agreement, there is, by definition, reasonable suspicion to support a search of his residence to "ensure compliance" with the conditions of his parole. Supp. Vol. I. Doc. 2 ¶ 5. Accordingly, there was nothing improper about searching Mr. Trujillo's residence on the basis of the failed and refused drug tests and the information received from Detective Dain.

### III.

For the reasons set forth above, we **AFFIRM** the district court's denial of Mr. Trujillo's motion to suppress.