**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JESSE CHRISTOPHER CORDOVA,

    Defendant-Appellant.

No. 08-4060
(D.C. No. 2:06-CR-00807-TS-1)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, Chief Judge, **HARTZ**, and **O'BRIEN**, Circuit Judges.

---

Jesse Christopher Cordova was convicted of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). On appeal, he argues (1) that the evidence obtained from the warrantless search of his car and home should be suppressed because his parole agreement allowing the search was not in effect and, in the alternative, because police lacked reasonable suspicion; (2) that statements made during his custodial interrogation should be suppressed because they were obtained in violation of his due process rights and his Sixth

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Amendment right to counsel; and (3) that the introduction of a prosecution witness without reasonable notice violated his Sixth Amendment Confrontation Clause rights. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Cordova's conviction.

## I. BACKGROUND

Mr. Cordova, a parolee at the time, was charged in a two-count indictment with possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Mr. Cordova moved to suppress ammunition found by officers during a parole search of his car and residence. Mr. Cordova also moved to suppress statements he made during interviews with a corrections officer while he was in custody awaiting parole revocation proceedings. After an evidentiary hearing, the district court denied Mr. Cordova's motion to suppress and his motion for reconsideration. Following a jury trial, Mr. Cordova was convicted on both counts and sentenced to 130 months in prison.

Mr. Cordova was previously convicted of an unrelated felony and signed a parole agreement promising not to possess firearms or violate any law. He also agreed that he would "permit officers from Adult Probation and Parole to search [his] person, residence, vehicle or any other property under [his] control without a warrant at any time, day or night, upon reasonable suspicion to ensure compliance with the conditions of [his] parole." Rec. vol. III, doc. 113, at 12.

A woman familiar with Mr. Cordova alerted his parole officer that Mr. Cordova might be violating the terms of his parole. Annette Martinez, who lived with Kollete Espinoza, Mr. Cordova's girlfriend, called a correctional facility to report that Mr. Cordova was threatening Ms. Espinoza, he had shotguns in his vehicle, and he admitted to Ms. Espinoza that he was using cocaine. Mr. Cordova's parole officer, Danny Platis, learned of the call and requested a police report. Mr. Platis then spoke with Ms. Martinez by telephone to confirm information in the report. Mr. Platis also met with Ms. Martinez and Ms. Espinoza at their residence.

Mr. Platis called Mr. Cordova and asked him to come to the parole office. There, Mr. Platis questioned Mr. Cordova, who denied that he had been using cocaine. Mr. Platis conducted a test for drug use, which was positive for cocaine. Mr. Platis then arrested Mr. Cordova, in the process taking his car keys. Mr. Platis and another officer went outside to his vehicle, where Mr. Cordova's mother was waiting for him in the passenger seat. The officers ordered her out of the vehicle and stated that they would search the vehicle, only afterwards asking for consent. The search of the vehicle revealed shotgun shells under the front seat. After discovering the shells, officers escorted Mr. Cordova to his residence where they located one red silver tip 12-gauge shotgun shell, sitting upright on his kitchen table.

Following Mr. Cordova's arrest, David Olive, an officer with the Department of Corrections, interrogated Mr. Cordova three times. Each time, Mr. Cordova signed a waiver form stating that he was aware of his rights. After the first interview turned up no inculpatory evidence regarding the firearms, the officers investigated an anonymous call to Mr. Platis in which the caller claimed Mr. Cordova may have given weapons to a friend to hold. Investigation of the call led to the home of Clifford Peterson, who claimed he had firearms belonging to Mr. Cordova, including a Ruger Model 1022 Carbine, a 12-gauge Winchester shotgun, and a Winchester Model 94 30/30. Mr. Olive interviewed Mr. Cordova again. This time, Mr. Olive falsely claimed that officers had found Mr. Cordova's fingerprints on the firearms at the Peterson residence. Mr. Cordova answered that he had inspected the weapons to purchase them, but had declined. Four days later, Mr. Cordova told Mr. Olive he wanted to talk. At that meeting, Mr. Olive told Mr. Cordova:

> I do know you were in the possession of many other firearms, and I'm in the process of tracking those down. But what will work in your favor is, if I do track them down, they will all count as one criminal episode. Now, if those firearms are used in an additional shooting and used in violent crimes, then that's something that's going to come back on you. So, if you're truthful[], I want to get them, get them locked in and get them off the street. I do know that you were in possession of them. I have interviewed a lot of Hispanics, your side of the trailer park, with a Hispanic officer.

Rec. vol. III, doc. 113, at 111-12. Substantial portions of this statement were misleading. Mr. Olive did not have proof Mr. Cordova was in possession of other

firearms, and Mr. Olive had not received many statements from other residents incriminating Mr. Cordova.

Mr. Olive made a number of additional misleading statements meant to induce Mr. Cordova to confess. He told Mr. Cordova: "Now, for your own behalf, come forward with the truth, will you?" *id.* at 115; "I can't show you my hand, but you will probably be shocked in your transport to Federal Court," in essence threatening Mr. Cordova with federal prosecution in which sentences are much higher, *id.* at 114-15; and "I have other witnesses that I haven't told you about, but I've given you the opportunity and will just go from there," *id.* at 117. Mr. Olive also told Mr. Cordova that he was aware Mr. Cordova had "lots of firearms," other than the three discovered at Mr. Peterson's house, *id.* at 118, and that the only thing Mr. Cordova could do to help himself was to "come truthful," *id.* at 119. Before Mr. Cordova left the interview, Mr. Olive told him that he had an "eight-hour window" to talk more and to help himself, and after which the window would close. Mr. Olive then said, "The benefit that you have in contacting me before the eight hours is up is that in the Federal system when you cooperate, the Courts do take that into consideration as far as sentencing goes. . . . [T]hey do take into consideration that you weren't very cooperative with me." Rec. vol. I, doc. 37, at 16.

Mr. Cordova requested yet another meeting with Mr. Olive. Mr. Cordova stated that Mr. Peterson and he had helped Ms. Espinoza move some items to a

storage facility. Mr. Cordova had discovered the guns wrapped in a blanket among the items to be moved. Because he was a felon, he asked Mr. Peterson to keep the guns. According to Mr. Cordova, the shotgun shells in the car probably were there because he helped Ms. Espinoza move.

Finally, on December 11, 2006, officers transported Mr. Cordova from the prison to federal court for hearing. Mr. Olive participated in the transportation. While in transit, Mr. Cordova raised the subject of the guns again, saying that they belonged to his girlfriend. Mr. Olive testified that he had kept telling Mr. Cordova during this transportation to the courthouse that Mr. Cordova should not talk about the investigation.

After the grand jury indicted Mr. Cordova, he moved to suppress the evidence from the searches and from the interrogations. The district court found that Mr. Cordova agreed to the search condition in his parole agreement and that the agreement remained in effect after officers took him into custody. The district court found that the search was supported by reasonable suspicion in the context of the reports of firearms in the car, the failed drug test, which Mr. Cordova had lied about, and the fact that Mr. Cordova was on parole. Furthermore, Mr. Cordova's mother consented to the search of the car. In the district court's view, the search of the residence was supported by reasonable suspicion based on the prior evidence and the shotgun shells found in Mr. Cordova's car.

The district court also found that Mr. Cordova validly waived his *Miranda* rights at each of the interviews, that Mr. Olive's misrepresentations to Mr. Cordova were "not the kind of trickery that creates an involuntary statement," that Mr. Olive had not promised leniency, and that overall, the statements were voluntary. *Id.* at 140. Furthermore, no Sixth Amendment right to counsel had attached because no formal charges had been filed, and there was no evidence Mr. Cordova had retained an attorney or one had been appointed for him.

A few days before trial, the government informed Mr. Cordova that it would be calling Ms. Espinoza to testify. Mr. Cordova objected, based on the government's late notice. Mr. Cordova also argued that Ms. Espinoza's testimony was not relevant to the issue of his alleged possession of firearms or ammunition on the dates charged in the indictment. The district court overruled the objection. In doing so, the court noted that the late disclosure was not the result of wrongdoing by the government and that the court had offered Mr. Cordova an opportunity to continue the case. Rec. vol. VI, doc. 110, at 19 ("I also offered the defendant a continuance and I was certainly prepared to consider that, although that wasn't my first opportunity, but in any event, the defendant rejected an opportunity to continue this case."). Mr. Cordova asked to question Ms. Espinoza regarding her criminal history, any prosecutions or arrests currently pending against her, and any history suggesting leniency on those arrests in exchange for her testimony, as well as her history of drug use during the time in question. The

court allowed questions about drug use, but limited questions about criminal history to open prosecutions.

Ms. Espinoza testified that Mr. Cordova had brought her to a motel, blocked the door to the room, and unwrapped a blanket containing four or five long guns. Mr. Cordova allegedly asked Ms. Espinoza which one she wanted to die with. Ms. Espinoza was able to convince Mr. Cordova that they could mend their relationship and was not harmed. Ms. Espinoza claimed she waited so long to report the incident because she was afraid of Mr. Cordova. Mr. Cordova elicited evidence that Ms. Espinoza was biased against him because his mother had evicted Ms. Espinoza and her mother from Mr. Cordova's mother's home and because Mr. Cordova had broken off their relationship.

A jury convicted Mr. Cordova on both counts of being a felon in possession of firearms and ammunition.

## II.  DISCUSSION

Mr. Cordova appeals the district court's denial of his motions to suppress evidence found during the search of his car and the statements made during his interviews with Mr. Olive. We agree with the district court that his parole agreement remained in effect and that reasonable suspicion supported the searches. We also agree with the district court that the interviews, though strewn with half-truths and misleading statements, did not rise to the level our precedents

require to violate Mr. Cordova's Fifth Amendment rights, and we agree that his Sixth Amendment rights to an attorney had not attached. Mr. Cordova also argues that the district court erred in allowing testimony from his ex-girlfriend, Ms. Espinoza, and in limiting his questioning of her. We hold that the district court's actions did not deny Mr. Cordova his Sixth Amendment Confrontation Clause rights. Therefore, we affirm.

## A. The district court properly denied Mr. Cordova's motion to suppress evidence found during the warrantless search of his vehicle and home.

When considering the denial of a motion to suppress, this court reviews the district court's "factual findings for clear error, viewing the evidence in the light most favorable to the government." *United States v. Lamy*, 521 F.3d 1257, 1261 (10th Cir. 2008). Legal determinations, such as whether a statement is voluntary, are reviewed de novo. *Id.* "The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008) (internal quotation marks omitted).

Mr. Cordova argues that because he was in police custody, his parole agreement was not effective. Aplt's Br. at 18 ("The bargain Defendant made to waive privacy for freedom was over."). The Tenth Circuit encountered the same argument in *United States v. Trujillo*, 404 F.3d 1238 (10th Cir. 2005). Mr. Trujillo, also a Utah parolee, signed an agreement allowing searches upon

reasonable suspicion. *Id.* at 1240. Like Mr. Cordova, Mr. Trujillo argued that his arrest suspended his parole agreement. *Id.* at 1241. In that case, we held that the parolee's "arrest did not affect the validity of the parole agreement." *Id.* at 1244. We explained that, based on prior Supreme Court precedent, *Griffin v. Wisconsin*, 483 U.S. 868 (1987), and *United States v. Knight*, 534 U.S. 112 (2001), the parolee's diminished expectation of privacy did not outweigh the governmental interest in ensuring effective rehabilitation of criminals and protecting the public from harm. *Trujillo*, 404 F.3d at 1242. Therefore, a search based on reasonable suspicion in the context of a parole agreement did not violate the Fourth Amendment.

Mr. Cordova, nonetheless, invites us to re-examine this holding and balance his expectation of privacy with the government's interests, in part based on *Samson v. California*, 547 U.S. 843 (2006), a Supreme Court opinion issued after *Trujillo*. In *Sampson*, the Supreme Court upheld a parole agreement that allowed searches of a parolee that lacked even reasonable suspicion. *Id.* at 857. Nothing in *Sampson* suggests our analysis in *Trujillo* was incorrect; therefore, we reaffirm that parole agreements remain in effect even when officials take parolees into custody.

We point out further that, even though Mr. Cordova was in police custody, he was still on parole. Mr. Cordova has a constitutional right to a hearing before revocation of parole. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). While he

enjoys this benefit of being on parole, he must suffer the burdens, in this case being subject to search. Indeed, Mr. Cordova was taken under a 72 hour hold, before a warrant could issue from the Board of Pardons for a parole violation. The parole agreement had not expired when Mr. Cordova was taken into custody.

Officers did not violate Mr. Cordova's parole agreement because, in accordance with the agreement, reasonable suspicion existed to search both his home and vehicle. Generally, reasonable suspicion exists when police are able to obtain sufficient independent corroboration of details provided by an informant. *See United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). Here, Ms. Martinez, and later Ms. Espinoza, informed police that Mr. Cordova had weapons and was doing cocaine. Though Ms. Martinez's report depended on what Ms. Espinoza told her, "[t]he fact that hearsay evidence would not be admissible at trial to prove guilt does not make it unusable" as a source of reasonable suspicion. *See Cortez v. McCauley*, 478 F.3d 1108, 1118 (10th Cir. 2007) (en banc). When Mr. Cordova submitted to the officer's drug test, he tested positive for cocaine, corroborating Ms. Martinez's and Ms. Espinoza's accounts. Mr. Cordova does not challenge the test or the results. Based on the informants' accounts and the corroborating drug test, officers could reasonably suspect to find evidence in Mr. Cordova's vehicle. Therefore, the search was permissible. Once the officers discovered shotgun shells in the car, they had additional suspicion to search Mr. Cordova's dwelling based on this further amount of corroboration.

**B. The district court did not violate Mr. Cordova's Fifth or Sixth Amendment rights by admitting evidence obtained during Mr. Cordova's interrogations**.

Mr. Cordova argues that the three interrogations violated his due process rights because his statements were not voluntary– that he was promised leniency and that Mr. Olive's misrepresentations about evidence against him left him with no alternative but to speak. Mr. Cordova further argues that the interrogation violated his Sixth Amendment right to counsel because the State of Utah has a contract to provide counsel to parolees at violation hearings.

In these circumstances, this court reviews factual findings for clear error and legal issues de novo. *United States v. Lott*, 433 F.3d 718, 721 (10th Cir. 2006). Whether a statement is voluntary is a legal determination, reviewed de novo. *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998).

### 1. Mr. Cordova's interrogation did not violate the Fifth Amendment.

Though Mr. Cordova waived his *Miranda* rights, the Fifth Amendment still protected him from being forced to make involuntary statements. "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997), *abrogated on other grounds in Corley v. United*

- 12 -

*States*, 129 S.Ct. 1558 (Apr. 6, 2009). "Whether a defendant's incriminating statements were made voluntarily must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation." *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999). The "essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *Id.* We consider the following factors in determining voluntariness: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *Id.* (internal quotation marks omitted).

Though Mr. Olive misrepresented facts to Mr. Cordova and suggested the court would be more lenient, several facts suggest the statements were voluntary: the questioning at each of the interviews was brief, none lasting more than thirty minutes; all three interviews occurred in an office setting with Mr. Olive in casual clothes without a gun; Mr. Olive expressly informed Mr. Cordova of his constitutional rights, which he acknowledged by signing a standard waiver form; and though he was handcuffed or shackled, Mr. Cordova was not threatened or subject to physical punishment.

Whether Mr. Olive made a promise of leniency is a factual question that we review for clear error. *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006). The district court determined that there was no promise of leniency, and we discern no clear error in that finding. Mr. Olive's statements that Mr. Cordova would benefit from telling the truth did not rise to the level of a promise of leniency, and Mr. Olive's actions, taken on a whole, do not appear to amount to a promise of leniency. *Cf. United States v. Morris*, 247 F.3d 1080, 1090 (10th Cir. 2001) (holding district court did not clearly err in its factual finding that officers showing a suspect photographs of "past criminals" and telling the suspect that the ones who repented received more lenient sentences was not a promise of leniency).

Nor do Mr. Olive's misrepresentations amount to the type of coercion necessary to violate the Fifth Amendment. "It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Lopez*, 437 F .3d at 1065 (citation and quotation marks omitted). Indeed, Mr. Olive misrepresented evidence against Mr. Cordova; still, the interrogation did not overbear Mr. Cordova's will. As the district court noted, the transcript indicates that the conversation was casual and that Mr. Cordova participated freely. Mr. Olive's misrepresentations that Mr. Cordova's prints were found on weapons, that Mr. Olive had witnesses, and that

Mr. Olive knew other guns existed, do not reach the level of misrepresentation sufficient to make the interrogation coercive.

### 2. Mr. Cordova's Sixth Amendment rights had not yet attached.

Although Mr. Cordova does not challenge his waiver of his Fifth Amendment right to counsel during the interrogation by Agent Olive, he nevertheless argues that the government violated his Sixth Amendment right to counsel. *See McNeil v. Wisconsin*, 501 U.S. 171, 177-78 (1991) (discussing the difference between the Fifth Amendment right to counsel, which protects "the suspect's desire to deal with the police through counsel" and the Sixth Amendment right to counsel, which "protects the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime") (internal quotation marks omitted). He notes that the State of Utah has a contract to provide counsel to parolees at parole violation hearings and he contends that at no point during his interrogations at the state prison did his assigned attorney attend the interrogations." Apt's Br. at 25.

We are not persuaded. The Sixth Amendment provides that "[i]n all criminal *prosecutions,* the accused shall enjoy the right to have the Assistance of Counsel for his defense." (emphasis added). "*Once the adversary judicial process has been initiated*, [it] guarantees the defendant the right to have counsel

present at all critical stages of the criminal proceedings." *Montejo v. Louisiana*, 129 S. C.t 2079, 2085 (2009). Here, formal charges had not been filed against Mr. Cordova at the time of the interrogations. He was interviewed in August, and the charges were filed in November. Thus, Mr. Cordova's Sixth Amendment rights had not attached. *See United States v. Mitcheltree*, 940 F.2d 1329, 1339 (10th Cir. 1991). ("Where no charges have been filed regarding the subject of interrogation, the sixth amendment right to counsel does not attach.").

**C. The district court did not violate Mr. Cordova's Confrontation Clause rights when it allowed Ms. Espinoza to testify at trial and when it limited questioning of Ms. Espinoza's criminal history to open matters.**

We review Confrontation Clause claims de novo. *United States v. Joe*, 8 F.3d 1488, 1492 (10th Cir. 1993).

The right to cross-examination is an important and integral component of the broader Sixth Amendment right to confrontation, but, vital as it is, it is not absolute or without some limitation. *United States v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001). A trial court "may impose *reasonable* limitations on cross examination, based upon concerns of 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (emphasis supplied) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The trial court is more likely to violate the Confrontation

- 16 -

Clause when it prevents all inquiry into an issue. *See Van Arsdall*, 475 U.S. at 679

Mr. Cordova argues that in light of the government's late disclosure of Ms. Espinoza's potential testimony, he had no opportunity to effectively cross-examine her. The government only learned of her potential testimony a week before trial, so nothing suggests the government intentionally impaired Mr. Cordova's ability to cross-examine her. The district court offered to entertain a motion for a continuance if Mr. Cordova was not prepared to meet the evidence, but Mr. Cordova declined to make such a motion. Therefore, Mr. Cordova indeed had a fair opportunity to prepare. The court would have granted a continuance had he asked for one.

Finally, Mr. Cordova's attorney makes several claims the court unconstitutionally limited cross-examination. Aplt's Br. at 27-28. Viewing the transcript, this does not appear to be the case. Rec. vol. V., doc. 112, at 19-31. Specifically, Mr. Cordova claims that the "trial court severely limited any questioning of Ms. Espinoza's drug use/abuse;" that the court limited questions concerning leniency she would obtain for testifying; and that the trial court limited Mr. Cordova to asking questions about open cases against Ms. Espinoza. Aplt's Br. at 28. We are not persuaded that the court's limitations were unconstitutional. The district court allowed inquiry into her drug use. Mr. Cordova was able to question her about drug cases, a shoplifting charge, and

- 17 -

failures to appear in court. *Id.* at 28-30. Additionally, Mr. Cordova asked Ms. Espinoza about any leniency she expected. *Id.* The district court did not violate the Sixth Amendment by limiting cross-examination to open criminal matters. Under the circumstances, Mr. Cordova had a sufficient opportunity to cross-examine Ms. Espinoza.

### III. CONCLUSION

Accordingly, we AFFIRM.

Entered for the Court


Robert Henry
Chief Judge