**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Shawn HUBBARD, Defendant.**
**No. CRIM.A.03–04–KAJ.**

United States District Court,
D. Delaware.

May 27, 2003.

Colm Connolly, Esquire, United States Attorney, Wilmington, Delaware and Leonard Stark, Esquire, Assistant United States Attorney, Wilmington, Delaware; counsel for the United States of America.

Penny Marshall, Esquire, Federal Public Defender, Wilmington, Delaware; counsel for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

Shawn Hubbard, a previously convicted felon, was indicted on January 15, 2003 for possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket Item ["D.I."] 1.) The indictment came as a result of a search that was performed in his residence pursuant to an administrative warrant. (D.I. 22 at 1.) Hubbard filed a motion (the "Motion") to suppress the evidence uncovered in the search, as well as incriminating statements he made when he was placed under arrest. (D.I.12.) The Court held a suppression hearing on March 19, 2003 (See D.I. 17) and provided the defendant and the Government the opportunity to brief the issues raised. (See D.I. 18, 20, 22, 23, and 27.) For the reasons set forth herein, the Court will deny the Motion.

### II. Facts

On March 6, 2002, Shawn Hubbard executed a "Conditions of Supervision" form with the Office of Probation and Parole of the Delaware Department of Correction. (Gov.Ex. 1.)[1] Among other things, Hubbard agreed that, in exchange for being placed on probation by the State, he would abide by certain specified conditions. (Id.) Among those conditions were that he

would not commit any new criminal offense (id. at ¶ 1), he would not possess or consume controlled substances or dangerous drugs without a prescription (id. at ¶ 7), and he would abide by a curfew established by his probation officer (id. at ¶ 13). The concluding paragraph of the form states in all capital letters, "you are subject to arrest and to a search of your living quarters, person or vehicle without a warrant at any time by a probation/parole officer." By his signature on the form, Hubbard stated, "I consent to and fully understand ... [the] content and meaning" of the conditions set forth. (Id.) On March 11, 2002, Hubbard signed a document acknowledging that the curfew set by his probation officer was 10:00 p.m. to 6:00 a.m. daily. (Gov. Ex. 1 at bates pg. A0114; D.I. 17 at 8.)

In late July of 2002, members of the Governor's Task Force ("GTF"), a combined group of probation officers and State police officers assigned to monitor probationers and enforce conditions of probation (D.I. 17 at 4), began communicating with one another about a tip that implicated Hubbard in illegal drug dealing. (Id. at 9–10.) The tip was passed on to Nicole O'Boyle, an experienced probation officer (id. at 3–5) who is also a member of the GTF (id. at 22). She read and saved the information about the tip but took no action on it at that time. (Id. at 22–23.)

The following September, Officer O'Boyle sent an e-mail to the probation officer responsible for supervising Hubbard and asked how Hubbard was faring on probation. (See id. at 23.) The supervising officer responded that Hubbard had tested positive for marijuana use. (Id.)

---

1. The exhibits referenced herein were offered by the Government and admitted in evidence at the suppression hearing held in this case on March 19, 2003, the transcript of which is Docket Item 17.

She checked again in November and learned that he had once more had a positive test for marijuana use. (*Id.*) Based upon the defendant's two positive tests for illegal drug use, Officer O'Boyle sought and received permission from one of her superiors to conduct an administrative search of Hubbard's residence. (*Id.* at 29–31.) She intended to search for illegal drugs and drug paraphenalia. (*Id.* at 30.) Officer O'Boyle and other GTF members attempted to conduct the administrative search on November 6, 2002, after Hubbard's 10:00 p.m. curfew. (*Id.* at 30–31.) They found that the defendant was not at home, despite it being past his curfew. (*Id.* at 31.) According to the woman who answered the door, Hubbard had gone to the hospital with the mother of his child. (*Id.*)

Officer O'Boyle obtained supervisory approval to attempt the administrative search a second time. (*Id.* at 32–33.) On the night of November 10, 2002, she returned to Hubbard's residence with other GTF members and this time the defendant answered the door. (*Id.* at 33.) Officer O'Boyle told Hubbard that she intended to "look around" the residence. (*Id.*) The defendant raised no objection. (*Id.*) Officer O'Boyle was accompanied by a police officer and, subsequently, they were joined by another probation officer and another police officer. (*Id.* at 34.)

The search was conducted by the two probation officers, with neither of the police officers participating. (*Id.*) During the search of the defendant's bedroom, the probation officers discovered small, plastic, zip-lock bags on his dresser, which Officer O'Boyle recognized from her experience as a type of packaging commonly used for illegal drugs. (*Id.* at 35.) They continued their search and discovered additional plastic bags in a safe and a marijuana pipe on the dresser. (*Id.* at 35–36.) At or around that point in the search, Officer O'Boyle checked under the defendant's mattress and discovered the gun which is the basis for the indictment in this case. (*See id.* at 36.) The police officers were made aware that the gun had been found. (*See id.* at 36, 77–78.) There was some discrepancy in the evidence regarding precisely when Hubbard was placed in custody, but at some point shortly before or after the gun was discovered, the defendant was arrested and handcuffed. (*See id.* at 35, 78.)

One of the police officers on the scene, Officer Meadows, wanted to question Hubbard about the gun and "any other activity that may be going on in the area." (*Id.* at 79.) Using a pre-printed card he kept in his a wallet, Officer Meadows read to the defendant the well-known rights set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (*Id.; See* Gov. Ex. 4.) After Hubbard was read his rights, the following exchange took place, as described by Officer Meadows: "When I asked him if he understood each of his rights, he did say yes, and when I asked him if having these rights in mind he wished to talk to us now, he also stated yes." (*Id.* at 81.) Hubbard then made incriminating statements explaining how he had acquired the gun and offering to cooperate with law enforcement in showing them how he was able to obtain firearms, if such cooperation would help him "work down" the charges against him. (*See id.* at 81–82.)

III. *Analysis*

The defendant seeks an order suppressing all of the evidence obtained at his residence because there was no reasonable suspicion to support the administrative search. (D.I. 22 at 10–14.) In addition, the defendant argues that his statements are inadmissible because the Government

failed to demonstrate that the waiver of his *Miranda* rights was knowing and voluntary. (*Id.* at 14–16.) Before turning to those substantive issues, it is necessary to dispose of certain evidentiary objections that were raised at the hearing and pressed again in the defendant's briefing.

A. Evidentiary Issues

I. Identity of Informant.

 Citing *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the defendant has argued that he is entitled to know the identity of the anonymous tipster who first focused the attention of the GTF on him. (D.I. 22 at 6–7.) *Roviaro* did hold that the Government must disclose the identity of an informant under certain circumstances, but the Supreme Court has also made it explicit that, "although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it has never been held to require the disclosure of an informant's identity at a suppression hearing." *United States v. Raddatz,* 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). On the contrary,

> the government possesses a qualified privilege to refuse to disclose the identity of a confidential informant from whom it received evidence of alleged criminal activity. Although this privilege may be overcome upon a proper showing of need, mere speculation as to the likely usefulness of disclosure has never sufficed to outweigh the government's interest in anonymity.

*U.S. v. Swan,* 545 F.Supp. 799, 811 (D.Del. 1982). In this case, the defendant has made no credible showing at all of a need for the tipster's identity. Whether the tip given was credible or not is irrelevant in this case because, in light of the defendant's two failed drug tests, there was ample basis for reasonable suspicion about Hubbard's violation of probation. As the Third Circuit stated in one of the cases the defendant himself relies upon, when an informant "was not an active participant or eyewitness, but rather a mere tipster ... courts have generally held that the informant's identity need not be disclosed." *U.S. v. Jiles,* 658 F.2d 194, 197 (3d Cir. 1981). Such is the case here, and, consequently, the informant's identity need not be disclosed.

2. Redactions in Documents.

 Hubbard argues that redactions in a document provided to the defense during discovery constituted violations of the *Jencks* Act, the Federal Rules of Criminal Procedure, and the Government's obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (*See* D.I. 22 at 7–8.) Under the Federal Rules of Criminal Procedure and the *Jencks* Act, 18 U.S.C. § 3500, the Government is obligated to provide its witnesses' statements to the defense after those witnesses have testified on direct examination. *See* Fed.R.Crim.P. 26.2(a) ("After a witness ... has testified on direct examination, the court ... must order ... [production of] any statement of the witness ... that relates to the subject matter of the witness's testimony."); 18 U.S.C. § 3500(a) ("In any criminal prosecution brought by the United States, no statement or report ... by a Government witness ... shall be the subject of ... inspection until said witness has testified on direct examination ....").

As the Government rightly notes, however, the information at issue here is not part of a witness's statement.

[A] witness's "statement" means: (1) a written statement that the witness makes and signs, or otherwise adopts or approves; (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed.R.Crim.P. 26.2(f). The information sought here fits none of the definitions of a "witness statement."

■ Neither is the information discoverable under the rule set forth in *Brady*. In that case, the Supreme Court stated that the Government's failure to produce "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Materiality is key. The Supreme Court has described the obligation imposed by the Due Process clause and set forth in Brady as a "prohibition against concealing evidence favorable to the accused[.]" *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). There has been no sound argument that the redactions at issue, which consist of a fax "header" and certain identifying information about a girlfriend of an individual alleged to be defendant's brother, comprise exculpatory, material information. The type of information redacted in this case plainly does not bear on the reasonableness of the suspicion provided by the two failed drug tests, nor does it bear on the unrefuted evidence discovered during the administrative search. There is no basis for believing that the unredacted information is exculpatory and, indeed, it seems wholly irrelevant to the question of the reasonable suspicions entertained by Officer O'Boyle and her colleagues. The

unredacted information need not be produced.

3. Hearsay.

■ The defendant contends that, under the hearsay rule, F.R.E. 801, it was improper for the Government to rely upon police reports (Gov.Ex. 5) to supplement the testimony provided during the hearing about the statements made by the defendant after his arrest. (D.I. 22 at 8–9.) As the defense recognizes, "the Federal Rules of Evidence ... 'do not operate with full force at hearings before the judge to determine the admissibility of evidence." ' (*Id.* at 8; citing *United States v. Matlock*, 415 U.S. 164, 173, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).) The arguments advanced by the defendant do nothing to undermine that general principle. "At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The suppression hearing is, quite simply, not the trial, and the concerns about reliability raised by the defense, while perhaps pertinent to the weight to be accorded the exhibit in question, are not a basis for excluding the documents at this stage of the proceedings. In any event, the Court has not relied upon the police reports in rendering its decision in this case.

B. Reasonable Suspicion to Support Search

Both the Government and the defense agree that probation officers may search a probationer's residence based on a reasonable suspicion that the probationer is engaged in criminal activity therein. (D.I. 20 at 13, D.I. 22 at 10; citing *United States v. Knights*, 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).) As the Supreme Court has instructed, "[w]hen an officer

has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Knights,* 534 U.S. at 121, 122 S.Ct. 587.

 As already noted, the Court finds that the two positive drug tests submitted by the defendant were sufficient in themselves to provide the reasonable suspicion necessary to support the administrative search of the defendant's residence. That the defendant had failed a curfew check and that there was an anonymous tip indicating that he was involved with drug trafficking are factors that would likely have added to the suspicions of a reasonable probation officer, but the positive drug tests alone were adequate to support the execution of an administrative warrant.[2]

### C. Admissibility of Confession

Finally, the defendant has argued that the Government failed to carry its burden of establishing that his post-arrest incriminating statements were given after a knowing and voluntary waiver of his rights. (D.I. 22 at 14–16.) As defendant puts it, "[t]o establish a knowing and intelligent waiver the government must prove that the defendant was read his rights, that the defendant understood those rights, and that the defendant affirmatively responded that he understood those rights." (*Id.* at 15; citing *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.) Contrary to the defendant's assertion that there is no proof that those things oc-

curred, Officer Meadows testimony directly established each and every one of the points that the defendant contends is a necessity. *See supra* at 5.

 There is no requirement in the law, as defendant seems to imply (D.I. 22 at 15–16), that a waiver must be evidenced by a written form. *See United States v. Stuckey,* 441 F.2d 1104, 1105 (3d Cir.1971) ("The rule in *Miranda* ... does not require that a waiver of rights be in writing ....") Nor does the fact that the defendant may have been "surprised" to find probation officers and police at his house (*id.* at 15) lessen the effect of the waiver that he voiced. The fact that the defendant decided to stop answering questions at a later point (D.I. 17 at 101) is evidence that he knew the difference between choosing to speak and choosing to remain silent and he knew how to exercise his right to choose those alternatives.

The defendant's motion to suppress is not well founded and will be denied. An appropriate Order will follow.

### ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date,

IT IS HEREBY ORDERED that the defendant's motion to suppress (D.I.12) is DENIED.

---

2. The defendant claims that the drug tests, which took place in late July and early October (Gov.Ex. 3) were "stale" by the time the administrative search was conducted and that there was no specific evidence tying drug use to the residence. (D.I. 22 at 12.) Both assertions are unpersuasive. The two positive drug tests suggested illegal use over a period of several months, and it was therefore entirely reasonable to suspect that the illegal activity was of a continuing nature. By the same token, it was sensible to suspect that some evidence of the defendant's illegal activities could be found at the defendant's residence.