NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1840
_____

MARC KEATING,
                              Appellant

v.

PITTSTON CITY; OFFICER TOKAR; OFFICER HOUSSEIN;
PENNSYLVANIA STATE POLICE; AGENT COSLETT
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Action No. 3-11-cv-00411)
District Judge: Honorable Joel H. Slomsky
_____

Argued:  October 28, 2015
_____

Before: GREENAWAY, JR., SCIRICA, and ROTH, *Circuit Judges.*

(Opinion Filed: March 10, 2016)

Lauren Gailey, Esq.
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Christian G. Vergonis, Esq. **[ARGUED]**
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
        *Attorneys for Appellant Marc Keating*

Joshua M. Autry, Esq. **[ARGUED]**
Frank J. Lavery, Jr., Esq.
Lavery Faherty Patterson
225 Market Street
Suite 304, P.O. Box 1245
Harrisburg, PA 17108
    *Attorneys for Appellees Justin Tokar and Maivaun Houssein*

J. Bart DeLone, Esq. **[ARGUED]**
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120
    *Attorney for Appellee Frank Coslett*

———————

OPINION[*]

———————

GREENAWAY, JR., *Circuit Judge*.

Plaintiff/Appellant Marc Keating appeals the District Court's entry of summary judgment in favor of Defendants/Appellees on his claims, brought pursuant to 42 U.S.C. § 1983, for unlawful searches and seizure in violation of his Fourth Amendment rights. Appellees are Pennsylvania State Parole Agent Frank Coslett and Pittston City Police Officers Justin Tokar and Maivaun Houssein. For the following reasons, we will affirm.

## I.    BACKGROUND

### A.    Factual Background

In 2009, Keating was on parole after his release from state prison and under the supervision of Agent Coslett. The terms of Keating's parole required him to maintain a residence as approved in a home provider agreement. If Keating were to have an

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

unauthorized change of residence, that would be a parole violation. *See* 37 Pa. Code § 63.4(2) (Pennsylvania Parole Code requiring that a parolee "[l]ive at the residence approved by the Board at release and not change residence without the written permission of the parole supervision staff").

On the morning of October 14, 2009, Agent Coslett and Keating met at 3 James Street in Pittston for a urine test. 3 James Street, the residence of Keating's parents, was Keating's approved residence for purposes of his home provider agreement. The status of another family-owned property, 90 Market Street, arose during their meeting. Keating had been renovating 90 Market Street and occasionally stayed there overnight. This fact piqued Agent Coslett's interest. Both he and Keating proceeded to 90 Market Street. Agent Coslett intended to search the residence to determine whether Keating was living there without authorization.[1]

Once inside 90 Market Street, Agent Coslett observed Francis Lombardo, Keating's cousin, asleep on a couch in the living room, which caused some consternation.[2] In the kitchen, Keating submitted to a field urine test, which tested positive for morphine—a violation of his parole conditions.[3] Keating showed Agent

---

[1] At some point—the parties dispute whether it was before or after Agent Coslett entered and searched 90 Market Street—Keating signed a new home provider agreement, seeking to change his approved residence to 90 Market Street.

[2] Agent Coslett testified that, as of October 2009, he knew Lombardo because Lombardo had been suspected of harboring Keating in 2005 when Keating had previously absconded supervision and because Keating had previously told Agent Coslett that he had used drugs with Lombardo.

[3] At oral argument, Keating contended that the positive drug result was in dispute because no documentation of the results had been produced during discovery. However,

3

Coslett what he identified as his bedroom and a second bedroom. A brief search of Keating's bedroom revealed, on a dresser, several personal checks not in Keating's name. Keating claimed that he had found the checks on the side of the road and had intended to give them to his lawyer, but had misplaced them. Agent Coslett also found, while in the kitchen, what he believed to be rum in the fridge—another violation of Keating's parole conditions.

Based on the identified parole violations, Agent Coslett decided to engage in a more complete search of 90 Market Street. Concerned for his safety given that he was outnumbered by Keating and Lombardo, Agent Coslett went outside and called his supervisor for backup. Agent Coslett was directed to request backup from the Pittston Police Department, which in turn dispatched Officers Tokar and Houssein (collectively, "the officers"). The Police Department also advised Agent Coslett that there were no reports of any misplaced or stolen checks.

When Officers Tokar and Houssein arrived at 90 Market Street, Agent Coslett advised them that he was going to search the residence and that Lombardo was inside. The record is unclear on what happened next. According to Agent Coslett, he reentered 90 Market Street with the officers and Keating trailing behind. Agent Coslett realized that Lombardo was gone from the living room, drew his weapon, and went upstairs with one of the officers to look for Lombardo. According to Keating, Officers Tokar and Houssein entered the house shouting for Lombardo, realized Lombardo was gone, drew

Keating's own testimony confirms that he submitted to a field urine test and that Agent Coslett told him that the results were positive for morphine. App. 216. Therefore, we

4

their weapons, and then all four men went upstairs. According to the officers, when they entered 90 Market Street, Lombardo was still asleep in the living room and after a brief visit upstairs, they discovered that he had departed and then all four individuals again proceeded upstairs to search for him.

Notwithstanding these varying accounts about the reentry into 90 Market Street, Agent Coslett testified that, after he and the officers realized that Lombardo was gone, he went upstairs believing that Keating had been instructed to remain downstairs with one of the officers. While surveying the upstairs bedrooms for Lombardo, Agent Coslett heard a toilet flush and found Keating in the upstairs bathroom. Suspecting that Keating was attempting to destroy or hide drugs, Agent Coslett ordered him to strip naked. At Agent Coslett's request, Keating bent over, spread his buttocks, and lifted his genitals. Officers Tokar and Houssein stood in the threshold of the bathroom during the search. No one touched Keating. No contraband was found during the strip search.

Agent Coslett handcuffed Keating and sat him in a chair downstairs under the supervision of Officer Houssein. Agent Coslett and Officer Tokar then conducted a more thorough search of the upstairs bedrooms. They found a further violation of Keating's parole conditions: a pellet gun in the second bedroom. After completing the search of the upstairs bedrooms, which took thirty minutes, Agent Coslett removed Keating's handcuffs. Agent Coslett and the officers ultimately departed without taking Keating into custody.

---

find no basis for disputing that Keating's field urine test was positive for morphine.

## B. Procedural Background

In an Amended Complaint filed in 2011, Keating brought suit pursuant to 42 U.S.C. § 1983 against the City of Pittston, the Pennsylvania State Police, Agent Coslett, and Officers Tokar and Houssein, alleging illegal searches and seizure in violation of his Fourth Amendment rights. The District Court dismissed the City of Pittston and the Pennsylvania State Police from the case.

Following discovery, both Agent Coslett and the officers filed motions for summary judgment, which Keating opposed. The District Court adopted the Magistrate Judge's Report and Recommendation over Keating's objections, concluded that the record established no Fourth Amendment violations, and granted summary judgment for Agent Coslett and Officers Tokar and Houssein. Keating timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a district court's grant of summary judgment, applying the same standard as the district court. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011). Summary judgment may be granted if the moving party demonstrates that there is no "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is material if it has "the potential to alter the outcome of the case." *N. Hudson*, 665 F.3d at 475. In determining whether a dispute of fact is genuine, the court must assess whether "the evidence is such that a reasonable jury could return a

6

verdict for the nonmoving party." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 483 n.17 (3d Cir. 2013) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

When considering whether summary judgment is appropriate, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (quoting *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)). "An inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)). At the summary judgment stage, a court must be mindful to not "weigh the evidence or make credibility determinations." *Id.* (quoting *Petruzzi's IGA Supermarkets v. Darling-Del. Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

## III.   ANALYSIS

Keating argues that he is entitled to a trial on whether the following were unreasonable warrantless intrusions in violation of the Fourth Amendment: (1) Agent Coslett's entry into 90 Market Street and the initial search of the residence; (2) the reentry and search by Agent Coslett along with Officers Tokar and Houssein; (3) the strip search of Keating; and (4) the handcuffing of Keating. We conclude that Keating has failed to establish genuine disputes of material facts sufficient to defeat summary judgment, and that the District Court properly found that Agent Coslett and Officers Tokar and Houssein are entitled to summary judgment as a matter of law.

**A. Keating Has Not Established a Genuine Dispute of Material Fact Regarding the Reasonableness of Agent Coslett's Entry into 90 Market Street and the Initial Search of Those Premises.**

Keating claims that Agent Coslett's entry into and initial search of 90 Market Street were unreasonable because Agent Coslett lacked sufficient justification to search the house to confirm whether Keating was residing there in violation of his parole conditions. We disagree.

"The fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search." *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005). Whether a search is reasonable under the general Fourth Amendment totality of the circumstances approach "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006); *see United States v. Williams*, 417 F.3d 373, 378 (3d Cir. 2005). Parolees have "severely diminished expectations of privacy by virtue of their status alone" because they consent to restrictive parole conditions such as reporting requirements, travel limitations, and drug testing in exchange for early release from prison. *Samson*, 547 U.S. at 852. By contrast, a state's "overwhelming interest" in supervising parolees to reduce recidivism "warrant[s] private intrusions that would otherwise not be tolerated under the Fourth Amendment." *Id.* at 853.

Therefore, a search of a parolee's residence may be reasonable even if conducted without a warrant and without probable cause. *See United States v. Knights*, 534 U.S. 112, 121 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987); *United States v.*

8

*Hill*, 967 F.2d 902, 909 (3d Cir. 1992).[4]  Reasonable suspicion suffices to justify a parole

agent's warrantless search of premises that parolees are on or have control of, including a

parolee's residence, when an agent reasonably believes that the premises contain

evidence of a parole violation.  *See United States v. Baker*, 221 F.3d 438, 443–44 (3d Cir.

2000); *Hill*, 967 F.2d at 908–09; 42 Pa. C.S.A. § 9912(d)(2) (authorizing parole agents to

conduct "property searches . . . if there is reasonable suspicion to believe that the real or

other property in the possession of or under the control of the offender contains

contraband or other evidence of violations of the conditions of supervision").[5]  An

analysis of reasonable suspicion considers, under the totality of the circumstances,

whether an official "has a particularized and objective basis for suspecting legal

wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

We conclude that the record is such that a reasonable jury could not return a

verdict for Keating, and that Agent Coslett is entitled to judgment as a matter of law, on

Keating's challenge to Agent Coslett's initial search of 90 Market Street.  It is undisputed

that, prior to his search of 90 Market Street, Agent Coslett knew that Keating had been

repairing the residence for several months and thus that Keating had access to and control

over the family property.  In addition, Agent Coslett testified that when he arrived at 3

---

[4] Both *Knights* and *Griffin* involved searches of probationers rather than parolees.  We treat both situations identically because "there is no constitutional difference between probation and parole for purposes of the [F]ourth [A]amendment."  *Williams*, 417 F.3d at 376 n.1 (quoting *Hill*, 967 F.2d at 909).

[5] A "property search" is defined as a "warrantless search of real property, vehicle or personal property which is in the possession or under the control of the offender."  61 Pa. C.S.A. § 6151.  "Real property" is defined as "[a]ny residence or business property of an offender, including all portions of the property to which the offender has access."  *Id.*

James Street and asked about the status of 90 Market Street, Keating volunteered that he was living there and had moved over all of his belongings. According to Agent Coslett, when he warned Keating that this change of residence was a parole violation, Keating chose to change his approved address to 90 Market Street and was willing to sign a new home provider agreement. Agent Coslett also stated that he went to 90 Market Street at Keating's request. These facts establish that Agent Coslett reasonably believed that Keating was living at 90 Market Street in violation of his parole conditions and, thus, had reasonable suspicion to believe that 90 Market Street would contain evidence of Keating's unauthorized change of residence. *See Shea v. Smith*, 966 F.2d 127, 131 (3d Cir. 1992) (a probation officer may enter third party home to confirm whether probationer has violated a condition of probation where the officer "reasonably believes" that the probationer resides there). Therefore, we find no violation of the Fourth Amendment based on Keating's decision to search 90 Market Street.

At oral argument, Keating identified certain areas in his deposition testimony as establishing a genuine dispute of material fact regarding whether Agent Coslett had sufficient information on the morning of October 14, 2009 to suspect that Keating had violated his parole conditions by changing his residence without authorization.[6] Although Keating agreed that Agent Coslett inquired about the status of 90 Market Street, in response to whether Keating told Agent Coslett that he was occasionally staying at 90 Market Street Keating testified: "No. I don't recall that I ever told him that"; "I don't

believe so, no"; and "I don't recall." App. 225–26. Keating also stated that Agent Coslett never asked whether Keating was staying at 90 Market Street. App. 225.

While mindful that we must not make credibility determinations or weigh the evidence at the summary judgment stage, we find Keating's testimony insufficient to create a genuine dispute of material fact. A lack of memory does not create a genuine dispute because an answer such as "I don't recall" is insufficient evidence to rebut affirmative testimony or at least create "fair doubt." *Cf. Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (citing favorably *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) (finding no genuine issue of material fact as to whether employer had knowledge of a sexual harassment incident where plaintiff could not "remember when or exactly what was said" in her discussion with her supervisor)); *Jersey Cent. Power & Light Co. v. Lacey Tp.*, 772 F.2d 1103, 1109 (3d Cir. 1985) (a finding of a genuine dispute means the evidence creates "a fair doubt").

Here, Keating's responses to whether he told Agent Coslett that he was occasionally staying at 90 Market Street are qualified with equivocations such as "I don't recall" or "I don't believe so." Rather than disputing Agent Coslett's detailed account of their discussion, Keating's answers invite speculation as how Agent Coslett may have learned that Keating was staying at 90 Market Street if Agent Coslett's testimony that Keating told him so is false. Such speculation is insufficient to defeat summary judgment. *Cf. Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does

---

[6] One citation offered by Keating does not relate to the facts *available to Agent Coslett* on the morning of October 14, 2009. *See* App. 217 (testimony from Keating without

11

not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Lexington Ins. Co.*, 423 F.3d at 333). Accordingly, we find no genuine dispute of material fact remains regarding the constitutionality of Agent Coslett's initial search of 90 Market Street.[7]

### B. The Continued Search of 90 Market Street by Agent Coslett and Officers Tokar and Houssein Was Reasonable.

Keating next challenges as unreasonable the reentry into and further search of 90 Market Street by Agent Coslett and Officers Tokar and Houssein. However, as Keating concedes, his claim fails if we conclude—as we do here—that the search by Agent Coslett and the officers was a reasonable continuation of Agent Coslett's initial search or based on independent, specific facts supporting reasonable suspicion. *See* Appellant's

---

reference to whether he told the information to Agent Coslett).

[7] Keating also contends that Agent Coslett's search exceeded the scope of its justification and was therefore unreasonable. We again conclude otherwise. Agent Coslett's preliminary search of 90 Market Street was limited to the living room, kitchen, and upstairs bedrooms. Thus, his search was limited to areas over which Keating had access and control and which might contain evidence of whether Keating was in fact residing at 90 Market Street—the suspected parole violation that justified Agent Coslett's search in the first instance. *Cf. Florida v. Royer*, 460 U.S. 491, 500 (1983) (a warrantless search "must be limited in scope to that which is justified by the particular purposes served by the [warrant] exception."). Moreover, before Agent Coslett's search of the upstairs, Keating's urine tested positive for morphine. A positive drug test by itself has been held to provide reasonable suspicion necessary to support a search of a probationer's residence. *See United States v. Hubbard*, 269 F. Supp. 2d 474, 480 (D. Del. 2003). In support of his impermissible scope argument, Keating points to his testimony that Agent Coslett "tore the place apart" during his initial search. *See* App. 205. However, such "conclusory allegations" are insufficient to oppose summary judgment. *See D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014). Keating also cites his testimony that the personal checks were under a textbook rather than in plain view. *See* App. 205. Even if this is true, given the "severely diminished expectations of privacy" of Keating as a parolee, *Samson*, 547 U.S. at 852, we find this testimony insufficient to render the scope of Agent Coslett's search unreasonable.

12

Br. at 27 ("Defendants thus cannot prevail here unless their warrantless re-entry into the home was either a reasonable continuation of the initial search or independently justified by an exception to the warrant requirement."); *Hill*, 967 F.2d at 910 ("[I]t is reasonable to allow a parole officer to search whenever he reasonably believes it is necessary to perform his duties. The decision to search must be based on specific facts.") (internal quotation omitted).

Here, we find Agent Coslett's decision to complete his search of 90 Market Street only when he had sufficient backup to secure his safety to be reasonable. Agent Coslett had reasonable suspicion that he might find evidence of Keating's prescription drug use based on his knowledge of Keating's past prescription drug use and Keating's positive urine test that day. Moreover, once inside 90 Market Street, Lombardo's flight and Keating's presence in the upstairs bathroom provided additional justification for the search of the residence. We find the search reasonable.[8]

### C.     The Strip Search of Keating Was Reasonable.

We also agree with the District Court that the strip search of Keating was reasonable under the circumstances. The reasonableness of a strip search or visual cavity

---

[8] Keating also argues that Officers Tokar and Houssein entered 90 Market Street with an impermissible purpose of pursuing Lombardo. As we have explained, "inquiries into the purpose underlying a [parole] search are themselves impermissible." *Williams*, 417 F.3d at 378 (citing *Knights*, 534 U.S. at 122). Rather, a search of a parolee's property is subject to "ordinary Fourth Amendment analysis" of the totality of the circumstances. *Id.* If Agent Coslett, the parole agent, had reasonable suspicion that evidence of parole violations existed within 90 Market Street, then entry by Agent Coslett and the officers was reasonable. Moreover, even if we considered Keating's assertion, we find it to be an unreasonable inference based on the totality of the circumstances.

search is assessed by considering the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (holding that prison officials may conduct visual body cavity searches in a reasonable manner).

We reiterate that Keating, as a parolee, had diminished privacy rights by virtue of his prior consent to warrantless personal searches by parole agents based on reasonable suspicion. *See Samson*, 547 U.S. at 852; 42 Pa. C.S.A. § 9912(d)(1) (authorizing a parole agent to conduct a personal search of a parolee "if there is a reasonable suspicion to believe that the [parolee] possesses contraband or other evidence of violations of the conditions of supervision"). As to the justification for initiating the strip search, Agent Coslett reasonably believed that Keating was attempting to destroy or hide contraband or drugs to prevent discovery during the ongoing search because: Agent Coslett had an underlying heightened level of suspicion because Keating had revealed an unauthorized change of address; Agent Coslett believed that Keating had disobeyed an instruction to remain downstairs; Keating had already tested positive for a prescription drug; Lombardo, whom Agent Coslett knew to have a history of drug use with Keating, had left the house during Agent Coslett's initial search; and Agent Coslett and the officers had begun to more thoroughly search the bedrooms. *See Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1009 (8th Cir. 2007) (where police had reasonable suspicion that individual was concealing evidence on his person, exigent circumstances justified a "private, hygienic and non-abusive strip search on the spot, rather than risk [the

14

individual] disposing of the evidence during the course of his transportation to the police station"); *Burns v. Loranger*, 907 F.2d 233, 237–38 (1st Cir. 1990) (finding exigent circumstances justifying a strip search where individual had no opportunity to dispose of any drugs concealed on her person after the police arrived, "which surely would augment the legitimate concerns of an experienced officer that [the individual's] requests to use the bathroom were not prompted by the call of nature, but the desire to be alone").

As to the manner in which the strip search was conducted, neither Agent Coslett nor the two male officers touched Keating during the strip search, which took place in the privacy of Keating's home. *See Richmond*, 490 F.3d at 1008 (law requires that officers of the same sex conduct strip search "in an area as removed from public view as possible without compromising legitimate security concerns"); *Polk v. Montgomery Co., Md.*, 782 F.2d 1196, 1201–02 (4th Cir. 1986) ("Whether the strip search was conducted in private is especially relevant in determining whether a strip search is reasonable under the circumstances.").

The Dissent first contends that summary judgment is barred by a dispute about whether Agent Coslett ordered Keating to remain downstairs. We disagree with the Dissent as to Keating's testimony on the issue but, even accepting that there is a dispute, we view the strip search in the totality of the circumstances. Here, the circumstances demonstrate that Keating could not be trusted and had broken the rules several times, leading a reasonable person to believe that Keating was hiding something on his person when Agent Coslett found him.

The Dissent also argues that Keating's constitutional rights were impinged when Agent Coslett conducted the strip search in the presence of the two police officers. However, we find that Agent Coslett conducted the search in sufficient privacy, given that it was conducted only in the presence of male police officers who were there for Agent Coslett's safety. *Cf. Amaechi v. West*, 237 F.3d 356, 361–62 (4th Cir. 2001) (finding strip search of arrestee unreasonable where it was conducted in front of arrestee's home, subject to viewing by the public). Despite the protestations of my colleague in dissent, we find that the conditions of Keating's strip search were not abusive or humiliating.

Under the totality of the circumstances, our view remains that there was no constitutional violation.

### D. The Seizure of Keating Was Reasonable.

Finally, we conclude that the brief seizure of Keating through handcuffing was reasonable under the circumstances. Reasonableness of a seizure is "determined by balancing 'the need of law enforcement officials against the burden on the affected citizens and considering the relation of the [officer's] actions to his reason for [seizing] the [individual].'" *Vargas v. City of Phila.*, 783 F.3d 962, 970 (3d Cir. 2015) (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995)). Here, the handcuffing of Keating for thirty minutes was a limited burden. *See Muehler v. Mena*, 544 U.S. 93, 99 (2005) (concluding that officers' handcuffing of occupant for two to three hours was a "marginal intrusion"). On the other hand, there was a clear need for the restraint given that: Lombardo had previously left the house; Agent Coslett had found evidence of

16

several parole violations and a potential crime; and Agent Coslett believed that Keating had previously disregarded an instruction to remain downstairs while he searched upstairs.

Balancing these considerations, we conclude that the brief seizure of Keating was reasonable. *See id.* (concluding that handcuffing of occupant for two to three hours was reasonable during a search of individual's house for weapons); *Torres v. United States*, 200 F.3d 179, 186 (3d Cir. 1999) (handcuffing of a suspect was reasonable where officers feared destruction or concealment of evidence).

## IV.   CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

ROTH, *Circuit Judge*, dissenting.

The privacy interests protected by the Fourth Amendment exist on a spectrum. At one end are the petty intrusions we all must endure by virtue of modern life, such as emptying one's pockets at the airport. At the other are those intrusions that can leave the subject feeling violated. Strip searches, the Supreme Court has held, are among the most intrusive searches the government can undertake.[1]

My colleagues believe that forcing Keating to disrobe and expose his most intimate areas to his parole officer and two police officers was "reasonable under the circumstances." Were this case before us after a jury trial, where facts had been found and the credibility of witnesses weighed, I might agree. Yet, this matter is before us on summary judgment and the circumstances under which this search occurred are in considerable dispute. As such, I must respectfully dissent in part.[2]

Keating contends that he was ordered upstairs and strip searched almost immediately after he and Coslett entered the Market Street house for the second time. Coslett contends that the search occurred later, after he had ordered Keating to stay downstairs while he and another officer searched the second floor of the house. According to Coslett, it was only after Keating "disobeyed" this instruction that Coslett ordered the strip search. Neither Tokar nor Houssein nor Keating recall Coslett's instruction. Given the considerable dispute as to whether this instruction was given and

---

[1] *Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979).
[2] While I dissent as to the reasonableness of the strip search, I join my colleagues' well-reasoned opinion in all other respects.

1

the way Coslett relies on Keating's alleged disobedience to justify his search, I find the record too murky to warrant summary judgment.

Even more troubling, I find all four of the factors the Supreme Court identified in *Bell* to be used in evaluating the reasonableness of strip searches to militate against a finding of reasonableness here. Notably, the search subjects in *Bell* were prisoners in state custody, whose privacy expectations were considerably lower than Keating's.[3] Yet, even for prisoners, the Supreme Court held that strip searches with a visual body cavity inspection, the same search to which Keating was subjected, were not presumptively reasonable and courts must be careful "not to underestimate the degree to which these searches may invade the personal privacy" of those being searched.[4] Thus, taking the facts in the light most favorable to Keating, the first factor, the scope of the particular intrusion, does not favor a finding of reasonableness.

The second element, the manner in which the search was conducted, is equally concerning. Keating contends that he asked Coslett to perform the search in private, with only Keating and Coslett present. Coslett denied the request and, instead, performed the search with the bathroom door open and Houssein and Tokar facing inward, watching. Although Coslett cited safety concerns as justifying this manner of search, noting the sudden disappearance of Lombardo, Coslett did not have similar safety concerns when he brought Keating to the Market Street residence, searched it, and conducted a urinalysis test, all without backup and with Lombardo in the house. Moreover, if officer safety

---

[3] *See Bell*, 441 U.S. at 559.
[4] *Bell*, 441 U.S. at 560.

2

were truly at issue, it defies reason to believe that the three officers were safer watching Keating disrobe and lift his genitals than allowing Coslett to search Keating in private while the other two officers faced outwards, watching for Lombardo's return or the emergence of another threat.

The third element, the justification for the search, is the subject of considerable dispute, as noted above. If Keating's account is credited, the search had virtually no justification at all. As for the fourth element, the place in which the search was conducted, a private home with three law enforcement officers present, is a far cry from the prison lockup in *Bell*, where the location of the strip search favored a reasonableness finding.

In *Bell*, the Supreme Court noted that, even in prisons, strip searches can be conducted in "an abusive fashion" and that such "abuse cannot be condoned."[5] Viewing the totality of the circumstances in the light most favorable to Keating, Coslett's strip search of Keating could be interpreted as just such an abuse, designed to humiliate Keating. Consequently, I would hold that there are sufficient disputes of material factual issues to send Keating's Fourth Amendment claim regarding his strip search to a jury. Therefore, as to this claim, I must respectfully dissent.

---

[5] *Id.*